B 104 [08/07]

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Patrick Surtain, Naivote Taulawakeiaho, and Matt McCoy | Bill Clay Crafton, Jr. |

| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Blake Muir Harper<br>HULETT HARPER STEWART LLP<br>225 Broadway, Suite 1350<br>San Diego, CA 92101 tel: 619/338-1133 | **ATTORNEYS** (If Known)<br>Jeffrey D. Cawdrey<br>Gordon & Rees LLP<br>101 West Broadway, Suite 2000<br>San Diego, CA 92101 Tel: 696-6700 |
|---|---|

| **PARTY** (Check One Box Only) | | **PARTY** (Check One Box Only) | |
|---|---|---|---|
| ☐ Debtor | ☐ U.S. Trustee/Bankruptcy Admin | ☒ Debtor | ☐ U.S. Trustee/Bankruptcy Admin |
| ☒ Creditor | ☐ Other | ☐ Creditor | ☐ Other |
| ☐ Trustee | | ☐ Trustee | |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Breach Of Fiduciary Duties, Constructive Fraud, Fraud, Violation Of California State Securities Laws, And Objecting To Dischargeability Of Debt Under 11 U.S.C. Sections 523(A)(2)(A), 523(A)(4), And 523(A)(19)(A)

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☐ 11 - Recovery of money/property - § 542 turnover of property<br>☐ 12 - Recovery of money/property - § 547 preference<br>☐ 13 - Recovery of money/property - § 548 fraudulent transfer<br>☒ 1  14 - Recovery of money/property - other | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61 - Dischargeability - § 523(a)(5), domestic support<br>☐ 68 - Dischargeability - § 523(a)(6), willful and malicious injury<br>☐ 63 - Dischargeability - § 523(a)(8), student loan<br>☐ 64 - Dischargeability - § 523(a)(15), divorce or separation obligation<br>   (other than domestic support)<br>☒ 4  65 - Dischargeability - other |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21 - Validity, priority or extent of lien or other interest in property | **FRBP 7001(7) – Injunctive Relief**<br>☐ 71 - Injunctive relief - reinstatement of stay<br>☐ 72 - Injunctive relief - other |
| **FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31 - Approval of sale of property of estate and of co-owner - § 363(h) | |
| | **FRBP 7001(8) Subordination of Claim or Interest**<br>☐ 81 - Subordination of claim or interest |
| **FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41 - Objection / revocation of discharge - § 727(c),(d),(e) | **FRBP 7001(9) Declaratory Judgment**<br>☐ 91 - Declaratory judgment |
| **FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51 - Revocation of confirmation | |
| **FRBP 7001(6) – Dischargeability**<br>☐ 66 - Dischargeability - § 523(a)(1),(14),(14A) priority tax claims<br>☒ 2  62 - Dischargeability - § 523(a)(2), false pretenses, false<br>   representation, actual fraud<br>☒ 3  67 - Dischargeability - § 523(a)(4), fraud as fiduciary, embezzlement,<br>   larceny | **FRBP 7001(10) Determination of Removed Action**<br>☐ 01 - Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§ 78aaa *et.seq.*<br>☒ 5  02 - Other (e.g. other actions that would have been brought in state<br>   court if unrelated to bankruptcy case) |
| **(continued next column)** | |

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $8,000,000.00 |

Other Relief Sought

Attorneys Fees & Costs

B 104

B 104 (Page 2) [08/07]

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | |
|---|---|
| NAME OF DEBTOR<br><br>Bill Clay Crafton, Jr. | BANKRUPTCY CASE NO.<br><br>13-9004-CL7 |
| DISTRICT IN WHICH CASE IS PENDING<br><br>Southern District of California | DIVISIONAL OFFICE | NAME OF JUDGE<br><br>Hon. Christopher B. Latham |

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF<br><br>Aaron Shea | DEFENDANT<br><br>Bill Clay Crafton, Jr. | ADVERSARY PROCEEDING NO.<br><br>13-90304 |
| DISTRICT IN WHICH ADVERSARY IS PENDING<br><br>Southern District of California | DIVISIONAL OFFICE | NAME OF JUDGE<br><br>Hon. Christopher B. Latham |

| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |
|---|---|
| /s/Blake Muir Harper | |

| DATE<br><br>12/06/13 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Blake Muir Harper |
|---|---|

# INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature**. This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

1  HULETT HARPER STEWART LLP
2  BLAKE MUIR HARPER; SBN: 115756
   bmh@hulettharper.com
3  225 Broadway, Suite 1350
4  San Diego, CA  92101
   Telephone:   (619) 338-1133
5  Facsimile:   (619) 338-1139

6
7  Attorneys for Creditors Patrick Surtain,
   Naivote Taulawakeiaho, and Matt McCoy

8

9          **IN THE UNITED STATES BANKRUPTCY COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

11  In re:                          | Case No. 13-09004-CL7

12  BILL CLAY CRAFTON, JR.          | **CREDITORS' COMPLAINT FOR**
13                                  | **BREACH OF FIDUCIARY DUTIES,**
              Debtor.               | **CONSTRUCTIVE FRAUD, FRAUD,**
14                                  | **VIOLATION OF CALIFORNIA STATE**
15                                  | **SECURITIES LAWS, AND A**
                                    | **DETERMINATION OF**
16                                  | **NONDISCHARGEABILITY OF DEBT**
17                                  | **UNDER 11 U.S.C. SECTIONS 523(a)(2)(A),**
                                    | **523(a)(4), and 523(a)(19)(A)**
18
19                                  | **DEMAND FOR JURY TRIAL**

20                                  | JUDGE:   Hon. Christopher B. Latham
21                                  | CRTRM:   Five – Room 318

22

23

24

25

26

27

28

1  Creditors Patrick Surtain, Naivote Taulawakeiaho, and Matt McCoy
2  (collectively "Creditors") hereby allege the following against the Debtor herein,
3  Bill Clay Crafton, Jr. ("Debtor" or "Crafton") based on personal knowledge,
4  information and belief, and their counsel's investigation and research:

5  ## NATURE OF THIS ACTION

6  1.  Creditors file this action in order to recover damages resulting from
7  Crafton's fraudulent and otherwise wrongful conduct.  The Claims herein are also
8  the subject of a pending arbitration before the American Arbitration Association
9  ("AAA"), Case No. AAA 73-148-Y-00294-13 ("Arbitration"), naming Debtor and
10  others.  This matter was initially filed against Crafton and others in the Superior
11  Court for San Diego County in June 2012.  By stipulation, the Court ordered the
12  cases sent to arbitration in San Diego, California, in May 2013.  A copy of the
13  Statement of Claim before the AAA is attached hereto as Exhibit A, and is
14  incorporated herein by reference.  Creditors have moved for relief from the
15  automatic stay to prosecute the pending Arbitration in that forum, which motion
16  was not opposed.

17  2.  As set forth herein, while Creditors were professional football players,
18  Debtor, then principal of Martin Kelly Capital Management LLC ("MKCM"), and
19  certain other Respondents in the Arbitration, acting as Creditors' registered
20  investment advisers with complete control and discretionary authority over their
21  investment accounts, purchased for them various privately placed and illiquid
22  securities that proved to be part of massive Ponzi scheme and ultimately became
23  worthless.

24  3.  In connection with the investment of Creditors' monies in risky,
25  unsuitable and concentrated investments, Debtor and certain other Respondents in
26  the Arbitration had close business ties to the various entities with whom they
27  invested Creditors' money and received undisclosed fees and commissions,
28  including "residual" commissions for maintaining the investments.  Despite

1

BILL CLAY CRAFTON, JR, Debtor; Case No. 13-9004-CL7

1  knowing of the precarious financial condition of the entities in which they invested,
2  Debtor and the other Respondents in the Arbitration did not advise the Creditors of
3  the true facts, but undertook secret behind-the-scenes actions to attempt to salvage
4  the investments.

5       4.      Debtor, along with the other Respondents in the Arbitration, by his
6  conduct breached his fiduciary obligations to Creditors, and otherwise engaged in
7  fraudulent and wrongful conduct, by *inter alia*: (a) failing to properly diversify
8  Creditors' investment accounts and otherwise improperly concentrating their
9  investments; (b) failing to independently audit and/or otherwise obtain an
10 independent valuation of Creditors' investments; (c) failing to advise Creditors
11 concerning the suitability and risk associated with Debtor's investment choices;
12 (d) failing to conduct adequate due diligence concerning Creditors' accounts; and
13 (e) making material misrepresentations, and concealing or otherwise failing to
14 disclose material information, relating to their accounts.  As a result of Debtor's
15 conduct, Creditors have suffered devastating financial losses and the significant
16 earnings from their short-lived football careers are gone.

17      5.      While the Arbitration was pending, on September 5, 2013, Debtor
18 filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy
19 Court for the Southern District of California.

20      6.      This action is also filed by Creditors to obtain declaratory relief
21 granting an order of nondischargeability under 11 U.S.C § 523(a)(2)(A).  The basis
22 for this determination is that Debtor made material misrepresentations that were
23 relied upon to the detriment of Creditors and committed actual or constructive
24 fraud, as described herein and in Exhibit A hereto, giving rise to Creditors' claims
25 herein.

26      7.      This action also seeks an order of nondischargeability under 11 U.S.C.
27 § 523(a)(4).  The basis for this determination is that Debtor acted as Creditors'
28 licensed financial advisor, creating a fiduciary duty to Creditors.  Debtor breached

2

1  that fiduciary duty and committed fraud and defalcation by intentionally

2  misrepresenting or concealing the nature of the alleged "investments" and "loans"

3  made with Creditors' funds and his relationships with other entities in which he

4  placed Creditors' funds, as described herein and in Exhibit A hereto. These actions

5  of Debtor have resulted in catastrophic loss of the assets entrusted to him by

6  Creditors, approximately valued at $8 million. Such conduct constitutes fraud or

7  defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4), and

8  entitles Creditors to an order of nondischargeability on their claims against Debtor.

9      8.     This action also seeks an order of nondischargeability under 11 U.S.C.

10  § 523(a)(19). The basis for this determination is that Debtor's acts were in

11  violation of California securities laws, as described herein and in Exhibit A hereto.

12                          **JURISDICTION**

13      9.     The Court has jurisdiction over the subject matter and over the parties

14  to this action pursuant to 28 U.S.C. § 1334(b).

15      10.    This Adversary Proceeding has been referred to this Court pursuant to

16  28 U.S.C. § 157(a) and this case arises under 28 U.S.C. §§ 157(b)(2)(I) and (J), 11

17  U.S.C. §§ 523(a)(2)(A) and (a)(4), and is a core proceeding. For all purposes

18  herein, Creditors consent to the entry of final judgments and orders by the

19  Bankruptcy Court.

20      11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409 because

21  the underlying Chapter 7 bankruptcy case of Debtor Bill Clay Crafton, Jr., filed on

22  September 5, 2013, is pending before this Court.

23                          **PARTIES**

24      12.    Creditor Patrick Surtain (hereinafter "Surtain"), was a professional

25  football player. He was drafted by and joined the Miami Dolphins football team

26  beginning with the 1998 season. Surtain had limited investment experience and

27  could not be certain how long his career as a football player would last. It was

28  therefore important to him that he preserve his earnings and invest them

3

BILL CLAY CRAFTON, JR, Debtor; Case No. 13-9004-CL7

conservatively. His football career ended in 2009.

13.    Claimant Naivote Taulawakeiaho, also known as "Freddy Keiaho" (hereinafter "Keiaho"), was a student at San Diego State University and a member of the football team through 2006. He was drafted by and joined the Indianapolis Colts football team beginning with the 2006 season, where he immediately began to earn significant amounts of money for the first time. Keiaho had no prior investment experience and could not be certain how long his career as a football player would last. It was therefore important to him that he preserve his earnings and invest them conservatively. His football career ended with the 2011 season due to multiple concussions.

14.    Creditor Matt McCoy (hereinafter "McCoy"), was a student at San Diego State University and a member of the football team through 2005. He was drafted by and joined the Philadelphia Eagles football team beginning with the 2005 season, where he immediately began to earn significant amounts of money for the first time. McCoy had limited investment experience and could not be certain how long his career as a football player would last. It was therefore important to him that he preserve his earnings and invest them conservatively.

15.    Debtor, who also goes by "Billy Crafton," was, until April 5, 2010, a licensed and registered financial advisor residing in San Diego County. He was a registered broker representative in San Diego for American Express prior to April 2003. From March 27, 2003 to November 27, 2006, he was with CSI Capital Management, Inc., in San Francisco. He was registered as an investment advisor with a firm he founded and owned in San Diego and for which he acted as principal, MKCM, beginning in June 2006. In approximately January 2010 he joined SunTrust by founding for them a San Diego office, but was not registered with them as a broker or financial advisor. He was apparently let go in or about September 2010. He has not been registered as either a broker or a financial advisor since that time, although he had some unknown business relationship with

4

1    YourSource Financial ("YourSource") beginning in approximately December 2010.

2        16.    This Adversary Proceeding is filed within the deadlines imposed by

3    the Bankruptcy Rules of Procedure to preserve Creditors' claim that the debts owed

4    to him by Crafton are nondischargeable.  Creditors have elected to proceed in the

5    Arbitration to obtain findings of fact regarding their claims and a liquidation of

6    such claims by the Arbitrator.  By filing this Adversary Proceeding, Creditors do

7    not intend to waive their choice of forum to proceed in the Arbitration to

8    completion, and concurrently with the filing of this Adversary Proceeding seek a

9    stay of this Adversary Proceeding, pending the outcome of the Arbitration.

10    <u>**SUBSTANTIVE ALLEGATIONS AGAINST DEBTOR**</u>

11        17.    Surtain first began to use Crafton as his financial advisor in the 2002-

12    2003 time frame.  Surtain was introduced to Crafton by a mutual friend.  Surtain

13    conveyed to Crafton that he was very conservative, wanted safety and did not want

14    to deal much in the stock market.  Initially, Crafton put Surtain's funds in money

15    market, fixed income and bond funds, with some equities.

16        18.    Keiaho first met Crafton in the summer of 2006 in San Diego.  Keiaho

17    knew other NFL players who used Crafton as their financial advisor.  Crafton gave

18    Keiaho some information about himself and represented to Keiaho that he was

19    "really safe."  Crafton also represented that he was registered with the NFL Players

20    Association and had insurance.  Keiaho told Crafton he was interested in very safe

21    and boring investments.  Safety, and not return, was his first priority.  In August

22    2006, Keiaho called Crafton from training camp and authorized him to be Keiaho's

23    financial adviser.  Crafton then opened a Schwab Institutional account for Keiaho,

24    for which MKCM was listed as the financial advisor.  Initially, Crafton put

25    Keiaho's funds in money market and bond funds.  In the Spring of 2007, Keiaho's

26    total account value was approximately $400,000.00, representing virtually his entire

27    assets.

28

5

19.     McCoy was referred to Crafton by his first player agent, who later lost his player agent license.  McCoy knew other NFL players who used Crafton as their financial planner.  Crafton gave McCoy some information about himself and represented to McCoy that he was "really safe."  Crafton also represented that he was registered with the NFL Players Association and had insurance.  McCoy told Crafton he was not interested in any aggressive investments because McCoy had previously in 2001 lost money in the stock market.  In August 2005, McCoy authorized Crafton to be McCoy's financial adviser.  Crafton then opened a Schwab Institutional account for McCoy, for which Crafton's then firm, CSI Capital Management, Inc. was listed as the financial advisor.  Initially, Crafton put McCoy's funds in money market and debt investments.  In approximately November 2006, McCoy's accounts were shifted to MKCM.  In the Spring of 2007, McCoy's total account value was approximately $670,000.00, representing virtually his entire assets.

20.     Based on the information each Creditor received from Crafton, each placed his trust in Crafton.  Crafton and his firm had full discretionary authority over Creditors' investment accounts.  Creditors each paid Crafton's firm a fee based on the assets under management by MKCM.

21.     In approximately April of 2005, Crafton purchased for Surtain 100 shares of MKA Real Estate Opportunity Fund I, LLC for $10,000 each, for a total of $1,000,000.00.  In January or February 2007, Crafton purchased for McCoy ten shares of MKA Real Estate Opportunity Fund I, LLC for $10,000.00 each, for a total of $100,000.00 or approximately 15% of his assets.  In February or March 2007, Crafton purchased for Keiaho 12 shares of MKA Real Estate Opportunity Fund I, LLC for $10,000.00 each, for a total of $120,000.00 or approximately 30% of his assets.  In May 2007, Crafton purchased for Surtain 1,000,000 shares of MKA Real Estate Qualified Fund I, LLC for $1.00 each, for a total of $1,000,000.00.  These MKA funds were unregistered illiquid entities purported to

6

1    be in the business of making asset-based real estate loans that Crafton represented
2    were "safer than U.S. Treasury bonds" that "wouldn't lose money even when the
3    market is bad."   In reality, the funds invested in highly risky and speculative
4    second, third, and fourth deeds of trust, were not safe, contained assets that were not
5    properly valued, involved transactions with related entities, and devolved into a
6    ponzi scheme whereby new monies were used to make payments or distributions to
7    other investors and to pay excessive fees and/or commissions to sales agents such
8    as Crafton.   Creditors are informed and believe that Crafton and his firm were
9    secretly paid a significant percentage of the cash invested and/or maintained in the
10   fund by Creditors as a "sales commission" or "fee," including residual fees, which
11   payments were not disclosed to Creditors.

12        22.     In late March 2007, Crafton purchased for Surtain 1,000,000 units in
13   Sonata Multi-Manager Fund, L.P., an unregistered illiquid entity, for $1.00 each,
14   for a total of $1,000,000.00.   In February or March 2007, Crafton also purchased
15   for Keiaho 20,000 units in Sonata Multi-Manager Fund, L.P., for $1.00 each, for a
16   total of $20,000.00.   In February or March 2007, Crafton also purchased for McCoy
17   100,000 units in Sonata Multi-Manager Fund, LP, for $1.00 each, for a total of
18   $100,000.00.   Crafton represented to one or more Creditor that Sonata invested in
19   solid companies, such as Target and K-Mart.   In fact, Sonata invested in other
20   unregistered entities including MKA Real Estate Qualified Fund I, LLC, and Low
21   Volatility Lending, LLC, another entity managed by the same managers as the
22   MKA funds.   Creditors are informed and believe that all these entities had ties to
23   and/or investments in Westmoore entities, described below.   Creditors are informed
24   and believe that Crafton received excessive undisclosed commission and/or fees
25   from the Sonata Multi-Manager Fund, L.P for purchasing interests for Creditors,
26   and for maintaining the investment.   For example, a September 15, 2006 "Third
27   Party Marketing Agreement" was entered into between Waters Capital Advisors,
28   LLC, the Manager of the Sonata Multi-Manager Fund, and MKCM to pay MKCM

7

1  20% of any fees earned by Waters from any client introduced by MKCM for the

2  lifetime of the investment, as a referral fee.

3       23.    In February or March 2007, Crafton purchased for Keiaho six shares

4  of Westmoore Lending Opportunity Fund, LLC, for $10,000.00 each, for a total of

5  $60,000.00, or 15% of his total assets.  In March 2007, Crafton also purchased for

6  McCoy ten shares of Westmoore Lending Opportunity Fund, LLC, for $10,000.00

7  each, for a total of $100,000.00, or 15% of his total assets.  On July 3, 2007,

8  Crafton purchased for Surtain $1,000,000.00 worth of Westmoore Lending

9  Opportunity Fund, LLC.  Crafton represented that this fund was safe and yielded

10 14%.  In fact, this fund was part of a group of entities controlled by a Matthew

11 Jennings that proved to be a ponzi scheme and was sued in June 2010 by the

12 Securities and Exchange Commission ("SEC") and subsequently placed in

13 receivership.  According to the SEC's complaint, the parent Westmoore entities

14 "operated a corporate shell game, treating the various Westmoore bank accounts as

15 one integrated  account from which funds, regardless of their source, could be used

16 to pay promised returns to investors."  The SEC complaint states that the

17 Westmoore entities raised more than $53 million in 2008 alone, and paid out $8.7

18 million of that amount to existing investors, in the form of stock, membership units

19 and promissory notes.  Some of its offerings promised exorbitant short-term returns

20 as high as 130% annually.

21      24.    One of the related Westmoore entities placed under SEC receivership

22 was Westmoore Securities.  Unbeknownst to Creditors, certain MKCM employees

23 directly worked for Westmoore Securities during the times described above.

24 Crafton did not disclose this connection, and Creditors are informed and believe

25 that Crafton and MKCM received excessive undisclosed commission and/or fees

26 from all the Westmoore Funds for purchasing interests for Creditors and for

27 maintaining the investments.  For example, Creditors are informed and believe that

28 Westmoore paid to an MKCM employee a commission on the Lending Opportunity

8

1    Fund of 1.8%, as well as residual fees on all Westmoore investments. Other
2    commissions were as high or higher than 4.5%.

3         25.    Crafton also was very familiar with Westmoore and its operations. In
4    late 2006, he was involved in negotiations for an unknown transaction that would
5    result in him owning 10% of Westmoore. In addition, Michael Abraham and Jason
6    Sugarman of MKA Capital would receive ownership interests of 17.5% each, as
7    part of the transaction. Creditors are uncertain if this or some other form of
8    business relationship was ever consummated or if Crafton or other MKCM
9    employees ever owned a part of Westmoore. Nevertheless, relations remained
10   close. In June 2008, for example, Crafton was paid $7,500 by Westmoore
11   Management under a "consulting agreement."

12        26.    In September 2007, Crafton purchased for Keiaho $30,000.00 of
13   additional units in Westmoore Lending Opportunity Fund, LLC, $30,000.00 of
14   additional units of Sonata Multi-Manager Fund, L.P., and $40,000.00 of units in
15   Low Volatility Lending, LLC. Low Volatility Lending was operated by the same
16   individual as the MKA Funds, and was similarly an unregistered illiquid fund.
17   Keiaho is informed and believes that Crafton received excessive undisclosed
18   commission and/or fees from these funds for purchasing an interest for Keiaho and
19   for maintaining the investment.

20        27.    On November 27, 2007, Crafton purchased for Surtain $200,000.00 of
21   units in Westmoore Capital Group B, another unregistered high-risk, illiquid,
22   Westmoore-affiliated entity. Surtain is informed and believes that Westmoore used
23   this money to acquire a controlling interest in a company called Starmed, which it
24   re-named Westmoore Holdings. Crafton received excessive undisclosed 4.5%
25   commissions and maintenance fees from this Fund for purchasing an interest for
26   Surtain and for maintaining the investment.

27        28.    On February 27, 2008, Crafton purchased for Surtain $1,000,000.00
28   of Mar Vista Multi-Strategy Fund. This unregistered hedge fund was organized and

9

1  ran by Martin Kelly Advisors, owned jointly by Crafton and an affiliate of MKCM.

2  Crafton did not disclose this relationship and conflict of interest to Surtain.  Surtain

3  is informed and believes that Crafton received excessive undisclosed commission

4  and/or fees from this Fund for purchasing an interest for Surtain.  In addition, Mar

5  Vista itself purchased interests in Westmoore funds.  By the end of the first quarter

6  of 2008, MKCM clients and Mar Vista combined to own 60% of the Westmoore

7  Lending Opportunity Fund.

8      29.      On March 7, 2008, Crafton purchased for Surtain $1,000,000.00 of

9  units in Westmoore Investment LP, which was another of the unregistered, high-

10  risk and illiquid Westmoore entities.  It purported to earn a 10% yield.  Surtain is

11  informed and believes that Crafton received excessive undisclosed commission

12  and/or fees from this Fund for purchasing an interest for Surtain and for

13  maintaining the investment.

14      30.      On April 3, 2008, Crafton purchased for Surtain a $750,000.00

15  Westmoore Secured Promissory Note from Westmoore Capital, Inc., with a

16  maturity date of 21 days, bearing interest of $39,000.00; The Note provided for "a

17  late fee of **Ten Percent** (10%) per month" (bold in original).  The Note was secured

18  by a security interest in 1620 North Lake Blvd., Tahoe City, California 96145, a

19  home purportedly "owned" by Matt Jennings.  Surtain is informed and believes that

20  Crafton never collected on this loan, filed a lien, or perfected a security interest for

21  Surtain.  The currently accrued interest on this Note would be in the millions of

22  dollars.  Clearly by this point, Crafton should have been aware that the Westmoore

23  entities suffered from a liquidity crisis.  Yet they took no action for Creditors

24  despite their fiduciary duties to them.

25      31.      Surtain believes and alleges that Crafton made other unlawful,

26  improper and unsuitable high-risk investments with his monies, but does not have

27  access complete information.  These include $250,000.00 in Terroir Hotel and

28  Resort Fund, LP, on October 20, 2006; $250,000.00 in Waveland Drilling Partners

BILL CLAY CRAFTON, JR, Debtor; Case No. 13-9004-CL7

1  2006-A, LP, on August 4, 2006; and $150,000.00 in 941 Del Mar Condos, LP, on
2  February 22, 2007, another entity with which Crafton was a principal.  Surtain is
3  informed and believes that Crafton received excessive undisclosed commission
4  and/or fees or other benefits from these entities for purchasing an interest for him
5  and for maintaining these investments.

6      32.    In late August 2008, Crafton purchased 5,000 shares of China Tel for
7  Keiaho for $10,558.45.  Matt Jennings of Westmoore was a member of the Board
8  of China Tel, and Westmoore purportedly owned a large stake in China Tel.

9      33.    In the summer of 2008, negotiations occurred involving a merger
10 between Westmoore, Sonata and Mar Vista or MKCM.  These discussions appear
11 to have subsequently fallen apart for unknown reasons, although Westmoore may
12 have acquired Water Advisors, the manager of Sonata.

13     34.    In or about August 2008, all of Creditors' investments in MKA Real
14 Estate Opportunity Fund I, LLC, were converted into the same face-value dollar
15 amount worth of Westmoore Investment LP, another Westmoore entity.  For
16 unknown reasons, these transfers may have been backdated to January 1, 2008.
17 Creditors were issued Notes that may have been secured by stock in China Tel
18 Group, Inc., a publicly traded company in which Westmoore claimed to have
19 significant holdings.  Matt Jennings was a member of the Board of China Tel.

20 **The SEC Opens an Investigation Concerning Westmoore**

21     35.    In late 2008, unbeknownst to Creditors, Westmoore suspended
22 interest and principal payments to investors.  Crafton knew, or should have known,
23 that all Westmoore affiliated entities had suspended interest and principal payments
24 to investors, including Creditors, in late 2008.  Crafton and MKCM, however,
25 failed to advise Creditors of this information.

26     36.    Upon information and belief, in late 2008 or early 2009, the SEC
27 opened an investigation into Westmoore and its affiliated entities.

28

BILL CLAY CRAFTON, JR, Debtor; Case No. 13-9004-CL7

37.     In January 2009, Matt Jennings, the principal of Westmoore, sent out an e-mail to all investors informing them that "Westmoore is unfortunately without the ability to make any principal, interest or withdrawal payments to its investors." The e-mail also advised that the Westmoore Lending Opportunity Fund would be closed down.  These Creditors were not provided the January 2009 e-mail from Westmoore, which instead was received by MKCM and Crafton on their behalf, who did not forward it on.

38.     Creditors are informed and believe that at some point, Westmoore took over the Sonata Fund.  In the Spring of 2009, Crafton was apparently instructed by Matt Jennings of Westmoore to take charge of Sonata.

39.     In or about November 2009, SunTrust Bank ("SunTrust") entered into an agreement to acquire substantially all of the assets of MKCM related to Crafton's "roster" of business, including Creditors' and numerous other professional athletes' accounts.  As part of its purchase of substantially all of the assets of MKCM, SunTrust entered into an Asset Purchase Agreement with Crafton and paid Crafton approximately $2.7 million.

40.     In late 2009, in order for SunTrust to acquire these assets, Crafton sought, and received, Creditors' and other clients' consent to transfer their accounts from MKCM to SunTrust.

41.     On January 19, 2010, the China Tel stock collateral for Surtain's $2 million Note appears to have been exchanged by written agreement for collateral in the form of common shares "of Fund.com, Inc., or other mutually agreed upon publicly traded stock, with a market value of $7,390,000.00," covering as well the $750,000 Note, and other interests held by him, including his interests in Mar Vista and Sonata.  The Collateral Exchange Agreement was signed by MKCM, and was not provided to Surtain.

42.     Beginning at least by January 2010, Crafton, and other MKCM personnel joined SunTrust, setting up a SunTrust office in San Diego and

12

1   continuing to use Charles Schwab as custodian of Creditors' investment holdings.

2   As a result of this transaction, Creditors' accounts were transferred to SunTrust.  In

3   connection with the transaction, Crafton also entered into a three-year employment

4   agreement with SunTrust.

5         43.    At all times relevant, Crafton and SunTrust failed to advise Creditors

6   concerning the suitability and risk associated with the investment strategy that had

7   been employed by Crafton.

8         44.    Crafton breached his fiduciary obligations, and otherwise engaged in

9   wrongful conduct, by failing to determine whether his investment strategy

10   concerning Creditors' accounts was suitable and/or otherwise sufficient to meet the

11   economic needs of Creditors given the status of their limited careers, their

12   instructions about their conservative investment desires, and other relevant factors.

13         45.    Upon information and belief, at all times relevant, Crafton knew, or

14   should have known, that the Westmoore entities had suspended interest and

15   principal payments to investors, including Creditors, in late 2008, and that

16   Creditors' accounts were in jeopardy.  Crafton breached his fiduciary obligations,

17   and otherwise engaged in wrongful conduct, by failing to advise Creditors that

18   Westmoore had suspended interest and principal payments to investors, including

19   Creditors, in late 2008.

20         46.    Upon information and belief, at all times relevant, Crafton knew, or

21   should have known, that the SEC was investigating Westmoore and that all

22   investments in Westmoore affiliated entities were at extreme risk of being lost or

23   otherwise devalued.  Crafton breached his fiduciary obligations, and otherwise

24   engaged in wrongful conduct, by failing to advise Creditors that the SEC had taken

25   action against Westmoore and that the value of their investment portfolio may be

26   affected.

27

28

BILL CLAY CRAFTON, JR, Debtor; Case No. 13-9004-CL7

47.    Indeed, for months after the SEC began investigating Westmoore, Crafton and MKCM and SunTrust continued to issue account statements to Creditors that identified their investment in Westmoore affiliated entities and reported that said investments had a significant market value.

48.    Creditors are informed and believe that on or about March 21, 2010, Matt Jennings, principal of Westmoore, sent out another e-mail to all Westmoore Investors with the subject line "Westmoore Business Plan Update." Jennings discussed a "restructuring plan," stated that Westmoore planned to liquidate "various holdings held by Westmoore" and advised that Westmoore was to offer "three choices to investors regarding the payout or conversion to equity of their accounts." Additionally, in the March 2010 e-mail, Mr. Jennings invited investors to contact Westmoore representatives "regarding their situation over the phone or in person."

49.    Creditors were not sent the March 2010 e-mail from Westmoore. Instead, the March 2010 e-mail from Westmoore was received by Crafton and MKCM and not forwarded.

50.    Crafton was, or should have been, aware of the March 2010 Westmoore e-mail, including that Westmoore was offering Westmoore investors – including Creditors – "three choices . . . regarding the payout or conversion to equity of their accounts"; however Crafton failed to advise Creditors of this information.

51.    On or about June 15, 2010, the SEC filed a Complaint – a case styled *SEC v. Westmoore Investment, L.P., et al*. – United States District Court for the Central District of California, Case No. 10-cv-00849 against Westmoore, obtained a Temporary Restraining Order concerning Westmoore's assets and, ultimately, a Receiver was appointed to administer and liquidate Westmoore's assets.

52.    On July 9, 2010, Charles Schwab notified investors that it would henceforth report values for the Westmoore entities as "N/A," for not available, due

14

1  to the ongoing investigation by the SEC.  These notices were sent to Creditors c/o
2  SunTrust and never shown to Creditors by Crafton.

3      53.     To make up for the drop in asset values that would appear on the
4  Creditors' future account statements from Schwab, Crafton was given by
5  Westmoore or their associates for the gifting to Creditors (and others) of shares in
6  two then-publicly traded companies, Rineon Group and WLMG Holdings.  Crafton
7  and/or SunTrust received a purported $25 million worth of these shares by mail on
8  August 9, 2010.  In exchange, Crafton agreed to have his clients purchase shares in
9  Gerova Financial, a NYSE-listed company, claiming to be a reinsurer based in
10  Bermuda ("Gerova"), with certain ties to Westmoore.  The addition of these stock
11  certificates was intended by Crafton to make up for the lost value of the Westmoore
12  investments.  Clients were sent Stock Powers to execute for Charles Schwab, the
13  custodian.  Surtain appears to have signed such documents on August 6, 2010 for
14  260,948 shares of WLMG Holdings and 161,193 shares of Rineon Group.
15  Subsequently, it was determined that the authenticity of these certificates could not
16  be verified.  Crafton caused all three Creditors to purchase significant amounts of
17  stock in Gerova in July 2010.  SunTrust unilaterally cancelled these Gerova
18  purchases for Surtain and McCoy in October 2010, returning their purchase price,
19  without explaining to either of them the reason for their action.  Trading in Gerova
20  was halted by the SEC on February 23, 2011.

21      54.     All of the investments described above became virtually worthless.
22  As a result of Crafton' actions, Creditors have suffered catastrophic financial losses.

23                          **CAUSES OF ACTION**

24                          **FIRST CLAIM FOR RELIEF**

25  **Claim for Breach of Fiduciary Duties and/or Aiding and Abetting Breach of**
26                  **Fiduciary Duty Under California Law**

27      55.     Creditors reallege and incorporate by reference, paragraphs 1 through
28  54 set forth above and Exhibit A hereto.

                                    15

56.     Investment advisors under the Investment Advisors Act of 1940 and California law owe a fiduciary duty to their clients.  A fiduciary under California law has a duty to use the amount of care that an ordinarily careful and prudent man would use in the management of his own affairs.  A financial advisor has a duty to make reasonable investment recommendations based on a reasonable inquiry into a client's investment objectives, financial situation and other factors, and always to place the client's interest above his or its own.  Consistent with a financial advisor's fiduciary duty, he should not recommend unregistered, non-exempt securities or receive undisclosed transaction-based or marketing compensation related to securities recommended to clients or for referring clients to another advisor broker-dealer.

57.     Debtor violated the fiduciary duties of care, loyalty, candor, good faith, and independence owed to Creditors and acted to put his personal interests ahead of the interests of Creditors, and/or have aided and abetted therein.

58.     By the acts, transactions and course of conduct alleged herein, Crafton failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Creditors by:

a)     failing to properly oversee and preserve Creditors' assets;

b)     ignoring or not protecting against the numerous conflicts of interest resulting from his employees' own interrelationships or connection with the Westmoore entities and others;

c)     making false representations and omitting to state material facts relating to the investments in which Crafton placed Creditors;

d)     investing Creditors' monies in clearly unsuitable investments that were extremely high-risk and illiquid;

e)     investing Creditors' monies in concentrations that added to the high-risk nature of the investments;

16

f)      investing Creditors' monies in entities that were themselves intertwined and related with one another, increasing the investment risk;

g)      receiving for themselves undisclosed payments, fees or benefits for investing Creditors' monies and/or maintaining the investment; and

h)      failing to take action when it was clear that Creditors faced the possible loss of their investments or to mitigate those losses in a prudent fashion.

59.      By reason of the foregoing acts, practices and course of conduct, Crafton grossly and willfully failed to exercise care and diligence in the exercise of his fiduciary obligations toward Creditors, and/or aided and abetted therein.

60.      As a result of the actions of Crafton, Creditors have been severely damaged.

## SECOND CLAIM FOR RELIEF
### Claim for Constructive Fraud

61.      Creditors reallege and incorporate by reference, paragraphs 1 through 60 set forth above.

62.      Under California law, an act or omission is considered fraudulent without relation to actual fraud where a fiduciary breaches his duty, without fraudulent intent, and thereby gains advantage by misleading another to his prejudice.

63.      By engaging in the acts and conduct alleged above, Crafton has committed a constructive fraud on Creditors.  Creditors justifiably relied on Crafton to their prejudice and have been damaged thereby.

## THIRD CLAIM FOR RELIEF
### Claim for Fraud and Deceit

64.      Creditors reallege and incorporate by reference, paragraphs 1 through 60 set forth above.

65.      Crafton, acting in concert with others, made intentional misrepresentations of material fact and deliberately omitted to state material facts

17

1   known to him while under a duty to disclose such facts, including the facts

2   described above.  As a result of this willful deception, Creditors invested with

3   Crafton, relied on him to their detriment, and were damaged thereby.  Crafton made

4   further misrepresentations and omitted material facts to willfully conceal his

5   ongoing fraudulent conduct.

6                        **FOURTH CLAIM FOR RELIEF**

7            **California Corporations Code Sections 25401 and 25501**

8        66.    Creditors reallege and incorporate by reference, paragraphs 1 through

9   60 set forth above.

10       67.    Debtor offered to sell and sold securities in this state to Creditors, as

11  described above.

12       68.    The written and oral communications between Debtor and Creditors

13  omitted to state a number of material facts necessary to make the balance of the

14  purchase communications, in the light of the circumstances under which they were

15  made, not misleading, including the matters set forth above.

16       69.    Creditors were not aware of the material misrepresentations and

17  omissions set forth above.

18       70.    Creditors seeks rescission of the transactions under California

19  Corporations Code § 25501.  Alternatively, Creditors seeks damages under

20  California Corporations Code § 25501.  Specifically, Creditors seeks damages in an

21  amount equal to the difference between: (l) the price at which Creditors purchased

22  the securities, plus fees and commissions paid to Crafton and MKCM, and (2) value

23  of the securities at the time of the filing of this Complaint.

24                        **FIFTH CLAIM FOR RELIEF**

25               **California Corporations Code Section 25504**

26       71.    Creditors reallege and incorporate by reference, paragraphs 1 through

27  60 and 66-70, set forth above.

28

BILL CLAY CRAFTON, JR, Debtor; Case No. 13-9004-CL7

72.    Crafton, MKCM, and the other Respondents in the Arbitration directly or indirectly controlled each other.

73.    Crafton materially aided in the acts, transactions, and conduct alleged above.

74.    Crafton, MKCM, and the other Respondents in the Arbitration, are jointly and severally liable to Creditors under California Corporations Code § 25504.

75.    Creditors seek rescission of the transactions under California Corporations Code §§ 25501 and 25504.  Alternatively, Creditors seek damages under California Corporations Code §§ 25501 and 25504.  Specifically, Creditors seek damages in an amount equal to the difference between: (l) the price at which Creditors purchased the securities, plus fees and commissions paid to Crafton, and (2) value of the securities at the time of the filing of this Complaint.

## **SIXTH CLAIM FOR RELIEF**

### **Nondischargeability Under 11 U.S.C. Section 523(a)(2)(A)**

76.    Creditors reallege and incorporate by reference, paragraphs 1 through 75 set forth above.

77.    Debts incurred by fraud, false pretenses, or false representations are nondischargeable under 11 USC § 523(a)(2)(A).

78.    The fraudulent actions of Debtor in this case form the basis of Debtor's debt to Creditors.

79.    Debtors are attempting to discharge this debt in the pending bankruptcy case, listing these Creditors' claims in schedule F as an unsecured creditor.

80.    Creditors are entitled to an Order that Debtor's indebtedness to Creditors in the approximate amount of $8,000,000.00 is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

19

## SEVENTH CLAIM

### Nondischargeability Under 11 U.S.C. Section 524(a)(4)

81.     Creditors reallege and incorporate by reference, paragraphs 1 through 75 set forth above.

82.     Debts incurred by fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny are nondischargeable under 11 U.S.C. § 523(a)(4).

83.     The fraudulent actions of Debtor in this case occurred in a fiduciary capacity as Creditors' financial advisor and form the basis of Debtor's debt to Creditors.

84.     Debtor is attempting to discharge this debt in the pending bankruptcy case, listing Creditors in schedule F as an unsecured creditor.

85.     Creditors are entitled to an Order that Debtor's indebtedness to Creditors in the approximate amount of $8,000,000.00 is nondischargeable under 11 U.S.C. § 523(a)(4).

## EIGHTH CLAIM FOR RELIEF

### Nondischargeability Under 11 U.S.C. Section 523(a)(19)

86.     Creditors reallege and incorporate by reference, paragraphs 1 through 75 set forth above.

87.     Debts incurred in violation of state securities laws or through common law fraud, deceit or manipulation in connection with the purchase or sale of any security, are nondischargeable under 11 U.S.C. § 523(a)(19).

88.     The actions of Debtor in this case in violation of the securities laws or through common law fraud, deceit or manipulation in connection with the purchase or sale of any security, form the basis of Debtor's debt to Creditors.

89.     Debtor is attempting to discharge this debt in the pending bankruptcy case, listing Creditors in schedule F as an unsecured creditor.

20

BILL CLAY CRAFTON, JR, Debtor; Case No. 13-9004-CL7

90. Creditors are entitled to an Order that Debtor's indebtedness to Creditors in the approximate amount of $8,000,000.00 is nondischargeable under 11 U.S.C. § 523(a)(4).

## PRAYER FOR RELIEF

WHEREFORE, Creditors pray for relief and judgment, as follows:

A. Awarding compensatory damages in favor of Creditors against Crafton for all damages sustained as a result of Crafton's wrongdoing, in an amount to be proven at trial, including interest thereon;

B. Awarding Creditors reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C. Awarding rescission or a rescissory measure of damages;

D. Awarding punitive and/or exemplary damages in an amount sufficient to punish Crafton;

E. Awarding a determination that the claims asserted herein and in Exhibit A hereto are nondischargeable; and

F. Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Creditors demand a trial by jury.

Respectfully submitted,

DATED: December 6, 2013          HULETT HARPER STEWART LLP

_/s/ Blake Muir Harper_
BLAKE MUIR HARPER

225 Broadway, Suite 1350
San Diego, CA 92101
Telephone:  (619) 338-1133
Facsimile:   (619) 338-1139

Attorneys for Creditors Patrick Surtain, Naivote Taulawakeiaho, and Matt McCoy

21

# Exhibit A

1   HULETT HARPER STEWART LLP
    KIRK B. HULETT, SBN: 110726
2   BLAKE MUIR HARPER, SBN: 115756
3   225 Broadway, Suite 1350
    San Diego, CA  92101
4   Telephone:      (619) 338-1133
    Facsimile:      (619) 338-1139
5   Email:  kirk@hulettharper.com
            bmh@hulettharper.com
6
7   Attorneys for Claimants

8                  **AMERICAN ARBITRATION ASSOCIATION**

9                        **SAN DIEGO, CALIFORNIA**

10  PATRICK SURTAIN, NAIVOTE              CASE NO. _____
    TAULAWAKEIAHO, and MATT MCCOY,
11                                        **CLAIMANTS' DEMAND FOR**
12              Claimants,                **ARBITRATION AND STATEMENT OF**
                                          **CLAIM**
13  v.

14  BILL CLAY CRAFTON JR., GAVIN
    LUCAS HAMELS, DONALD MARTIN
15  STUTHERS, MARTIN KELLY CAPITAL
    MANAGEMENT, LLC, MARTIN KELLY
16  ADVISORS LLC, MICHAEL LOREN SEID,
    MAR VISTA MULTI STRATEGY FUND
17  LP, and SUNTRUST BANK,

18              Respondents.

19

20

21

22

23

24

25

26

27

28

───────────────────────────────────────────────────
       CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1    Claimants Patrick Surtain, Naivote Taulawakeiaho, and Matt McCoy (collectively

2    "Claimants") hereby notify all Respondents of their intent to pursue arbitration before the

3    American Arbitration Association.

4                          **NATURE OF THIS ACTION**

5         1.    Claimants file this action in order to recover damages resulting from

6    Respondents' fraudulent and otherwise wrongful conduct.  As set forth herein, while Claimants

7    were professional football players, Respondents Bill Clay Crafton, then principal of Respondent

8    Martin Kelly Capital Management LLC ("MKCM"), Gavin Hamels, Donald Martin Stuthers, and

9    Michael Loren Seid (collectively "MKCM Respondents"), acting as Claimants' registered

10   investment advisers with complete control and discretionary authority over their investment

11   accounts, purchased for them various privately placed and illiquid securities that proved to be part

12   of massive Ponzi scheme and ultimately became worthless.

13        2.    In connection with the investment of Claimants' monies in risky, unsuitable and

14   concentrated investments, the MKCM Respondents all had close business ties to the various

15   entities with whom they invested Claimants' money and received undisclosed fees and

16   commissions, including "residual" commissions for maintaining the investments.  Despite

17   knowing of the precarious financial condition of the entities in which they invested, the MKCM

18   Respondents did not advise the Claimants of the true facts, but undertook secret behind-the-

19   scenes actions to attempt to salvage the investments.

20        3.    In late 2009 or early 2010, after conducting due diligence into MKCM,

21   Respondent SunTrust Bank ("SunTrust") purchased substantially all of Respondent Martin

22   Kelly's assets under management, (at a price determined based on the "value" of the MKCM

23   Respondents' customer accounts) and the MKCM Respondents except Seid became employees of

24   Respondent SunTrust.  Despite SunTrust's due diligence investigation and the fact that none of

25   these investments were performing, Respondents (including SunTrust) failed to take any action,

26   or make any recommendation, to liquidate the Claimants' investment accounts or otherwise

27   advise Claimants of the suitability and risk associated with Respondents' investments on their

28   behalf.  In fact, despite Respondents' knowledge that the value of Claimants' investment account

1

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1   – as stated on the account statements provided by to them by Respondents – was overstated and

2   otherwise at serious risk of being lost or otherwise significantly devalued, Respondents failed to

3   advise Claimants of this information and, instead, continued to sell Claimants additional financial

4   products, including products specifically designed to benefit SunTrust, such as mortgages and

5   other loans.

6       4.      Respondents by their conduct breached their fiduciary obligations to Claimants,

7   and otherwise engaged in fraudulent and wrongful conduct, by *inter alia*: (a) failing to properly

8   diversify Claimants' investment account and otherwise improperly concentrating their

9   investments; (b) failing to independently audit and/or otherwise obtain an independent valuation

10  of Claimants' investments; (c) failing to advise Claimants concerning the suitability and risk

11  associated with Respondents' investment choices; (d) failing to conduct adequate due diligence

12  concerning Claimants' account; and (e) making material misrepresentations, and concealing or

13  otherwise failing to disclose material information, relating to their accounts.

14      5.      As a result of Respondents' conduct, Claimants have suffered devastating

15  financial losses and the significant earnings from their short-lived football careers are gone.

16  **<u>PARTIES</u>**

17      6.      Claimant Patrick Surtain (hereinafter "Surtain"), was a former professional

18  football player.  He was drafted by and joined the Miami Dolphins football team beginning with

19  the 1998 season.  Claimant had limited investment experience and could not be certain how long

20  his career as a football player would last.  It was therefore important to him that he preserve his

21  earnings and invest them conservatively.  His football career ended in 2009.  He currently resides

22  in Florida.

23      7.      Claimant Naivote Taulawakeiaho, also known as "Freddy Keiaho" (hereinafter

24  "Keiaho"), was a student at San Diego State University and a member of the football team

25  through 2006.  He was drafted by and joined the Indianapolis Colts football team beginning with

26  the 2006 season, where he immediately began to earn significant amounts of money for the first

27  time.  Claimant had no prior investment experience and could not be certain how long his career

28  as a football player would last.  It was therefore important to him that he preserve his earnings and

2

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1    invest them conservatively.  His football career ended with the 2011 season due to multiple

2    concussions.  He is currently a resident of Ventura County, California.

3        8.    Claimant Matt McCoy (hereinafter "McCoy"), was a student at San Diego State

4    University and a member of the football team through 2005.  He was drafted by and joined the

5    Philadelphia Eagles football team beginning with the 2005 season, where he immediately began

6    to earn significant amounts of money for the first time.  Claimant had limited investment

7    experience and could not be certain how long his career as a football player would last.  It was

8    therefore important to him that he preserve his earnings and invest them conservatively.  He is

9    currently a resident of San Diego, California.

10        9.    Respondent Bill Clay Crafton Jr., who goes by "Billy Crafton," (hereinafter

11    "Crafton"), was, until April 5, 2010, a licensed and registered financial advisor residing in San

12    Diego County.  He was a registered broker representative in San Diego for American Express

13    prior to April 2003.  From March 27, 2003 to November 27, 2006, he was with CSI Capital

14    Management, Inc., in San Francisco.  He was registered as an investment advisor with a firm he

15    founded in San Diego and for which he acted as principal, MKCM, beginning in June 2006.  In

16    approximately January 2010 he joined SunTrust by founding for them a San Diego office, but was

17    not registered with them as a broker or financial advisor.  He was apparently let go in or about

18    September 2010.  He has not been registered as either a broker or a financial advisor since that

19    time, although he had some unknown business relationship with YourSource Financial

20    ("YourSource") beginning in approximately December 2010.  Claimants are informed and believe

21    that he still resides in San Diego County.

22        10.    Respondent Gavin Lucas Hamels ("Hamels") was a registered broker

23    representative with Westmoore Securities, Inc. from August 2007 through January 2009.  He was

24    also registered as an investment advisor representative with MKCM in San Diego, California

25    from October 25, 2007 through April 5, 2010 and was employed there from February 2007 to

26    April 2010.  He was employed by SunTrust in San Diego, California from January 2010 through

27    September 2010 and registered as an investment advisor with YourSource in San Diego from

28    December 2010 to the present.  He was fired by SunTrust on September 24, 2010 for

3

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1    unauthorized trading in a client account.  Claimants are informed and believe he resides in San
2    Diego County.

3          11.    Respondent Donald Martin Stuthers ("Stuthers") was a registered broker and
4    investment advisor with Westmoore Securities, Inc. from October 2006 through January 2009.
5    He was also registered as an investment advisor representative with MKCM in San Diego,
6    California from November 3, 2006 through April 5, 2010 and employed there from June 2006 and
7    April 2010.  Claimants believe he was employed by SunTrust in San Diego, California from
8    January 2010 through September 2010 and registered as an investment advisor with YourSource
9    in San Diego from December 2010 to the present.  Claimants are informed and believe he resides
10   in San Diego County.

11         12.    Respondent MKCM is an investment adviser firm based in San Diego that was
12   founded by Crafton in June 2006.

13         13.    Respondent Martin Kelly Advisors LLC ("Martin Kelly Advisors") is the General
14   Partner for the Mar Vista Multi Strategy Fund LP.  Seid and Crafton were 50% owner of Martin
15   Kelly Advisors.  Gavin Hamels is also believed to have been associated with Martin Kelly
16   Advisors in same unknown capacity.

17         14.    Respondent Michael Loren Seid ("Seid") is a registered investment advisor who
18   has been a partner in and has worked for MKCM since August 2007, and worked for Westmoore
19   Securities from August 2007 to December 2008.  He was a registered broker's representative until
20   December 2011.

21         15.    Respondent Mar Vista Multi Strategy Fund LP is a hedge fund promoted and run
22   by Martin Kelly Advisors and Seid, located in Del Mar, California.

23         16.    Respondent SunTrust is a subsidiary of SunTrust Banks, Inc., which is a financial
24   services holding company.  Respondent SunTrust owns, operates, and/or controls various
25   subsidiaries, affiliates, offices, agencies, trade names, partners and/or shareholders including, but
26   not limited to, SunTrust Sports and Entertainment Specialty Group, which acquired the accounts
27   under management from MKCM.  Upon information and belief, Respondents Crafton, Hamels,
28   and Stuthers were employed by Respondent SunTrust (collectively "SunTrust Respondents") in

4

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

San Diego at times relevant to this proceeding, including January 2010 through late 2010.

**JURISDICTION AND VENUE**

17.     These cases were initially filed against the MKCM Respondents in the Superior Court for San Diego County in June 2012.  By stipulation, the Court ordered the cases sent to arbitration in May 2013.  Those Orders are attached hereto as Exhibits 1-3.  Copies of Financial Services Agreements with MKCM for McCoy and Keiaho are attached hereto as Exhibits 4 and 5.  Claimant Surtain is not in possession of a Financial Services Agreement.  The standard form Financial Services Agreements provide that all disputes be submitted to arbitration conducted under the provisions of the commercial arbitration rules of the American Arbitration Association.

18.     MKCM and Crafton assigned the Financial Services Agreements of their clients, including Claimants, to Respondent SunTrust in connection with the purchase of MKCM's and Crafton's accounts under management in late 2009 or early 2010.  Acting with the clients' consent, SunTrust assumed the Financial Services Agreements.

19.     A substantial portion of the transactions and wrongs complained of herein, including the Respondents' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in support of the unlawful conduct, occurred in this County; and Respondents have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect here.  Additionally, the Respondents maintain, or did maintain during relevant times, residences and/or substantial operations in this County.

**SUBSTANTIVE ALLEGATIONS AGAINST RESPONDENTS**

20.     Surtain first began to use Crafton as his financial advisor in 2002-2003 time frame.  Surtain was introduced to Crafton by a mutual friend.  Surtain conveyed to Crafton that he was very conservative, wanted safety and did not want to deal much in the stock market.  Initially, Crafton put Surtain's funds in money market, fixed income and bond funds, with some equities.

21.     Keiaho first met Crafton in the summer of 2006 in San Diego.  Keiaho knew other NFL players who used Crafton as their financial advisor.  Crafton gave Keiaho some information about himself and represented to Keiaho that he was "really safe."  Crafton also represented that he was registered with the NFL Players Association and had insurance.  Keiaho told Crafton he

1   was interested in very safe and boring investments.  Safety, and not return, was his first priority.

2   In August 2006, Keiaho called Crafton from training camp and authorized him to be Keiaho's

3   financial adviser.  Crafton then opened a Schwab Institutional account for Keiaho, for which

4   MKCM was listed as the financial advisor.  Initially, Respondents put Keiaho's funds in money

5   market and bond funds.  In the Spring of 2007, Keiaho's total account value was approximately

6   $400,000.00, representing virtually his entire assets.

7        22.    McCoy was referred to Crafton by his first player agent, who later lost his player

8   agent license.  McCoy knew other NFL players who used Crafton as their financial planner.

9   Crafton gave McCoy some information about himself and represented to McCoy that he was

10  "really safe."  Crafton also represented that he was registered with the NFL Players Association

11  and had insurance.  McCoy told Crafton he was not interested in any aggressive investments

12  because McCoy had previously in 2001 lost money in the stock market.  In August 2005, McCoy

13  authorized Crafton to be McCoy's financial adviser.  Crafton then opened a Schwab Institutional

14  account for McCoy, for which Crafton's then firm, CSI Capital Management, Inc. was listed as

15  the financial advisor.  Initially, Respondents put McCoy's funds in money market and debt

16  investments.  In approximately November 2006, McCoy's accounts were shifted to MKCM.  In

17  the Spring of 2007, McCoy's total account value was approximately $670,000.00, representing

18  virtually his entire assets.

19       23.    Based on the information each Claimant received from Crafton, each placed his

20  trust in Crafton.  Crafton and the other Respondents had full discretionary authority over

21  Claimants' investment accounts.  Claimants each paid the Respondents a fee based on the assets

22  under management by Respondents.

23       24.    In approximately April of 2005, Respondents purchased for Surtain 100 shares of

24  MKA Real Estate Opportunity Fund I, LLC for $10,000 each, for a total of $1,000,000.00.  In

25  January or February 2007, Respondents purchased for McCoy ten shares of MKA Real Estate

26  Opportunity Fund I, LLC for $10,000.00 each, for a total of $100,000.00 or approximately 15%

27  of his assets.  In February or March 2007, Respondents purchased for Keiaho 12 shares of MKA

28  Real Estate Opportunity Fund I, LLC for $10,000.00 each, for a total of $120,000.00 or

6

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

approximately 30% of his assets.  In May 2007 Respondents purchased for Surtain 1,000,000 shares of MKA Real Estate Qualified Fund I, LLC for $1.00 each, for a total of $1,000,000.00. These MKA funds were unregistered illiquid entities purported to be in the business of making asset-based real estate loans that Crafton represented were "safer than U.S. Treasury bonds" that "wouldn't lose money even when the market is bad."  In reality, the funds invested in highly risky and speculative second, third, and fourth deeds of trust, were not safe, contained assets that were not properly valued, involved transactions with related entities, and devolved into a ponzi scheme whereby new monies were used to make payments or distributions to other investors and to pay excessive fees and/or commissions to sales agents such as Respondents.  Claimants are informed and believe that Respondents were secretly paid a significant percentage of the cash invested and/or maintained in the fund by Claimants as a "sales commission" or "fee," including residual fees, which payments were not disclosed to Claimants.

25.     In late March 2007, Respondents purchased for Surtain 1,000,000 units in Sonata Multi-Manager Fund, L.P., an unregistered illiquid entity, for $1.00 each, for a total of $1,000,000.00.  In February or March 2007, Respondents also purchased for Keiaho 20,000 units in Sonata Multi-Manager Fund, L.P., for $1.00 each, for a total of $20,000.00.  In February or March 2007, Respondents also purchased for McCoy 100,000 units in Sonata Multi-Manager Fund, LP, for $1.00 each, for a total of $100,000.00.   Crafton represented to one or more Claimant that Sonata invested in solid companies, such as Target and K-Mart.  In fact, Sonata invested in other unregistered entities including MKA Real Estate Qualified Fund I, LLC, and Low Volatility Lending, LLC, another entity managed by the same managers as the MKA funds. Claimants are informed and believe that all these entities had ties to and/or investments in Westmoore entities, described below.  Claimants are informed and believe that Respondents received excessive undisclosed commission and/or fees from the Sonata Multi-Manager Fund, L.P for purchasing interests for Claimants, and for maintaining the investment.  For example, a September 15, 2006 "Third Party Marketing Agreement" was entered into between Waters Capital Advisors, LLC, the Manager of the Sonata Multi-Manager Fund, and MKCM to pay MKCM 20% of any fees earned by Waters from any client introduced by MKCM for the lifetime

7

1  of the investment, as a referral fee.

2    26.    In February or March 2007, Respondents purchased for Keiaho six shares of

3  Westmoore Lending Opportunity Fund, LLC, for $10,000.00 each, for a total of $60,000.00, or

4  15% of his total assets.  In March 2007, Respondents also purchased for McCoy ten shares of

5  Westmoore Lending Opportunity Fund, LLC, for $10,000.00 each, for a total of $100,000.00, or

6  15% of his total assets.  On July 3, 2007, Respondents purchased for Surtain $1,000,000.00 worth

7  of Westmoore Lending Opportunity Fund, LLC.  Crafton represented that this fund was safe and

8  yielded 14%.  In fact, this fund was part of a group of entities controlled by a Matthew Jennings

9  that proved to be a ponzi scheme and was sued in June 2010 by the Securities and Exchange

10  Commission ("SEC") and subsequently placed in receivership.    According to the SEC's

11  complaint, the parent Westmoore entities "operated a corporate shell game, treating the various

12  Westmoore bank accounts as one integrated  account from which funds, regardless of their source,

13  could be used to pay promised returns to investors."    The SEC complaint states that the

14  Westmoore entities raised more than $53 million in 2008 alone, and paid out $8.7 million of that

15  amount to existing investors, in the form of stock, membership units and promissory notes.  Some

16  of its offerings promised exorbitant short-term returns as high as 130% annually.

17    27.    One of the related Westmoore entities placed under SEC receivership was

18  Westmoore Securities.  Unbeknownst to Claimants, Respondents Hamels, Seid, and Stuthers also

19  directly worked for Westmoore Securities during the times described above.  Respondents did not

20  disclose this connection, and Claimants are informed and believe that Respondents received

21  excessive undisclosed commission and/or fees from all the Westmoore Funds for purchasing

22  interests for Claimants and for maintaining the investments.    For example, Claimants are

23  informed and believe that Westmoore paid to Stuthers a commission on the Lending Opportunity

24  Fund of 1.8 %, as well as residual fees on all Westmoore investments. Other commissions were as

25  high or higher than 4.5%.

26    28.    Crafton also was very familiar with Westmoore and its operations.  In late 2006,

27  he was involved in negotiations for an unknown transaction that would result in him owning 10%

28  of Westmoore.  In addition, Michael Abraham and Jason Sugarman of MKA Capital would

8

receive ownership interests of 17.5% each, as part of the transaction.  Claimants are uncertain if this or some other form of business relationship was ever consummated or if Crafton or other Respondents ever owned a part of Westmoore.  Nevertheless, relations remained close.  In June 2008, for example, Crafton was paid $7,500 by Westmoore Management under a "consulting agreement."

29.     In September 2007, Respondents purchased for Keiaho $30,000.00 of additional units in Westmoore Lending Opportunity Fund, LLC, $30,000.00 of additional units of Sonata Multi-Manager Fund, L.P., and $40,000.00 of units in Low Volatility Lending, LLC.  Low Volatility Lending was operated by the same individual as the MKA Funds, and was similarly an unregistered illiquid fund.  Keiaho is informed and believes that Respondents received excessive undisclosed commission and/or fees from these funds for purchasing an interest for Keiaho and for maintaining the investment.

30.     On November 27, 2007, Respondents purchased for Surtain $200,000.00 of units in Westmoore Capital Group B, another unregistered high-risk, illiquid, Westmoore-affiliated entity.  Surtain is informed and believes that Westmoore used this money to acquire a controlling interest in a company called Starmed, which it re-named Westmoore Holdings.  Respondents received excessive undisclosed 4.5% commissions and maintenance fees from this Fund for purchasing an interest for Surtain and for maintaining the investment.

31.     On February 27, 2008, Respondents purchased for Surtain $1,000,000.00 of Mar Vista Multi-Strategy Fund.  This unregistered hedge fund was organized and ran by Martin Kelly Advisors, owned jointly by Crafton and Seid.  Respondents did not disclose this relationship and conflict of interest to Surtain.  Surtain is informed and believes that Respondents received excessive undisclosed commission and/or fees from this Fund for purchasing an interest for Surtain.  In addition, Mar Vista itself purchased interests in Westmoore funds.  By the end of the first quarter of 2008, MKCM clients and Mar Vista combined to own 60% of the Westmoore Lending Opportunity Fund.

32.     On March 7, 2008, Respondents purchased for Surtain $1,000,000.00 of units in Westmoore Investment LP, which was another of the unregistered, high-risk and illiquid

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1  Westmoore entities.  It purported to earn a 10% yield.  Surtain is informed and believes that

2  Respondents received excessive undisclosed commission and/or fees from this Fund for

3  purchasing an interest for Surtain and for maintaining the investment.

4      33.    On April 3, 2008, Respondents purchased for Surtain a $750,000.00 Westmoore

5  Secured Promissory Note from Westmoore Capital, Inc., with a maturity date of 21 days, bearing

6  interest of $39,000.00; The Note provided for "a late fee of **Ten Percent** (10%) per month" (bold

7  in original).  The Note was secured by a security interest in 1620 North Lake Blvd., Tahoe City,

8  California 96145, a home purportedly "owned" by Matt Jennings.  Claimant is informed and

9  believes that Respondents never collected on this loan, filed a lien, or perfected a security interest

10  for Surtain.  The currently accrued interest on this Note would be in the millions of dollars.

11  Clearly by this point, the MKCM Respondents should have been aware that the Westmoore

12  entities suffered from a liquidity crisis.  Yet they took no action for Claimants despite their

13  fiduciary duties to them.

14      34.    Surtain believes and alleges that Respondents made other unlawful, improper and

15  unsuitable high-risk investments with his monies, but does not have access complete information.

16  These include $250,000.00 in Terroir Hotel and Resort Fund, LP, on October 20, 2006;

17  $250,000.00 in Waveland Drilling Partners 2006-A, LP, on August 4, 2006; and $150,000.00 in

18  941 Del Mar Condos, LP, on February 22, 2007, another entity with which Crafton was a

19  principal.  Surtain is informed and believes that Respondents received excessive undisclosed

20  commission and/or fees or other benefits from these entities for purchasing an interest for him and

21  for maintaining these investments.

22      35.    In late August 2008, Respondents purchased 5,000 shares of China Tel for Keiaho

23  for $10,558.45.  Matt Jennings of Westmoore was a member of the Board of China Tel, and

24  Westmoore purportedly owned a large stake in China Tel.

25      36.    In the summer of 2008, negotiations occurred involving a merger between

26  Westmoore, Sonata and Mar Vista or MKCM.  These discussions appear to have subsequently

27  fallen apart for unknown reasons, although Westmoore may have acquired Water Advisors, the

28  manager of Sonata.

10

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

37.    In or about August 2008, all of Claimants' investments in MKA Real Estate Opportunity Fund I, LLC, were converted into the same face-value dollar amount worth of Westmoore Investment LP, another Westmoore entity.  For unknown reasons, these transfers may have been backdated to January 1, 2008.  Claimants were issued Notes that may have been secured by stock in China Tel Group, Inc., a publicly traded company in which Westmoore claimed to have significant holdings.  Matt Jennings was a member of the Board of China Tel.

**The SEC Opens an Investigation Concerning Westmoore**

38.    In late 2008, unbeknownst to Claimants, Westmoore suspended interest and principal payments to investors.  The MKCM Respondents knew, or should have known, that all Westmoore affiliated entities had suspended interest and principal payments to investors, including Claimants, in late 2008.  The MKCM Respondents, however, failed to advise Claimants of this information.

39.    Upon information and belief, in late 2008 or early 2009, the SEC opened an investigation into Westmoore and its affiliated entities.

40.    In January 2009, Matt Jennings, the principal of Westmoore, sent out an e-mail to all investors informing them that "Westmoore is unfortunately without the ability to make any principal, interest or withdrawal payments to its investors."  The e-mail also advised that the Westmoore Lending Opportunity Fund would be closed down.  Claimants were not provided the January 2009 e-mail from Westmoore, which instead was received by the MKCM Respondents on their behalf, who did not forward it on.

41.    Claimants are informed and believe that at some point, Westmoore took over the Sonata Fund.  In the Spring of 2009, Crafton was apparently instructed by Matt Jennings of Westmoore to take charge of Sonata.

**SunTrust Acquires Substantially All of the Assets of MKCM and Hires Crafton, Stuthers, and Hamels**

42.    In 2009, Respondent SunTrust was aggressively seeking to expand their "Sports and Entertainment Specialty Group" and was eager to break into the San Diego, California market.

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

43.     One of the reasons that Respondent SunTrust was aggressively expanding its "Sports and Entertainment Specialty Group," and its representation of professional athletes, was the opportunity to cross-sell other SunTrust products; such as mortgages, to these athletes. Surtain entered into a two-year line of credit with SunTrust to build a new home secured by portions of his investment account in mid-2009.  This loan led to disastrous consequences in 2011 when the value of the investment account had dissipated.

44.     Beginning in or about March 2009, Respondent SunTrust entered into negotiations with Respondent Crafton in an effort to entice him to serve as the co-head of the San Diego office of SunTrust's Sports and Entertainment division, thereby taking the MKCM Respondents' entire "roster" of professional athletes and their accounts under management, and the resulting business and prestige, to SunTrust affiliated entities.  As part of its contemplated purchase of these accounts, Respondent SunTrust agreed to pay Respondent Crafton an amount based, at least in part, on the "value" of Respondent Crafton's athlete accounts under management.

45.     In or about November 2009, Respondent SunTrust entered into an agreement to acquire substantially all of the assets of Respondent MKCM related to Respondent Crafton's "roster" of business, including Claimants' and numerous other professional athletes' accounts. As part of its purchase of substantially all of the assets of Respondent MKCM, Respondent SunTrust entered into an Asset Purchase Agreement with Respondents MKCM and Crafton and paid Respondent Crafton approximately $2.7 million.

46.     In late 2009, in order for Respondent SunTrust to acquire these assets, the MKCM Respondents sought, and received, Claimants' consent to transfer their accounts from MKCM to SunTrust.

47.     On January 19, 2010, the China Tel stock collateral for Claimant Surtain for his $2 million Note appears to have been exchanged by written agreement for collateral in the form of common shares "of Fund.com, Inc., or other mutually agreed upon publicly traded stock, with a market value of $7,390,000.00," covering as well the $750,000 Note, and other interests held by him, including his interests in Mar Vista and Sonata.  The Collateral Exchange Agreement was

12

1    signed by Respondent Hamels for MKCM, and was not provided to Surtain.

2        48.    Beginning at least by January 2010, Hamels, Crafton, and Stuthers joined

3    SunTrust, setting up a SunTrust office in San Diego and continuing to use Charles Schwab as

4    custodian of Claimants' investment holdings.  As a result of this transaction, Claimants' accounts

5    were transferred to Respondent SunTrust.  Seid purchased and took over what was left of MKCM

6    for $1.00.  In connection with the transaction, Crafton also entered into a three-year employment

7    agreement with Respondent SunTrust.

8    **Sun Trust Fails to Conduct or Ignores Adequate Due Diligence, Breaches Their Fiduciary Duties and Otherwise Engages in Wrongful Conduct**

9

10        49.    Eager to expand its "Sports and Entertainment Specialty Group" and enticed by

11   the opportunity to cross-sell SunTrust products, such as mortgages, to its growing "roster" of

12   professional athletes, Respondent SunTrust: ignored, or otherwise overlooked, obvious red flags

13   concerning the investment strategies, unsuitability, lack of diversification, obvious violations of

14   fiduciary duty, and wrongful conduct by the MKCM Respondents, including, but not limited to,

15   their relationships with Jennings and Westmoore affiliated entities.

16        50.    At all times relevant, Respondent SunTrust failed to independently audit or

17   otherwise obtain an independent valuation of investments made in Claimants' account.

18        51.    At all times relevant, Respondent SunTrust: failed to advise Claimants concerning

19   the suitability and risk associated with the investment strategy that had been employed by the

20   MKCM Respondents.

21        52.    At all times relevant, Respondent SunTrust failed to properly diversify Claimants'

22   investment portfolio and allowed him to hold an unsuitable portfolio, which contained an

23   improper concentration of his investments in Westmoore affiliated entities.

24        53.    Respondents, as Claimants' investment advisers, owed a fiduciary duty to

25   Claimants.

26        54.    Respondents SunTrust and Crafton breached their fiduciary obligations by failing

27   to conduct (or ignoring) due diligence concerning the value and/or liquidity of the assets in

28   Claimants' account including, but not limited to, investments made in the Westmoore affiliated

13

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1    entities.

2        55.    Respondent SunTrust breached its fiduciary obligations, and otherwise engaged in

3    wrongful conduct, by hiring the MKCM Respondents except Seid and failing to evaluate or

4    otherwise supervise the investment strategy concerning Claimants' accounts.

5        56.    Respondents breached their fiduciary obligations, and otherwise engaged in

6    wrongful conduct, by failing to determine whether Respondent Crafton's investment strategy

7    concerning Claimants' account was suitable and/or otherwise sufficient to meet the economic

8    needs of Claimants given the status of their limited careers, their instructions about their

9    conservative investment desires, and other relevant factors.

10        57.    Upon information and belief, at all times relevant, Respondents knew, or should

11    have known, that Westmoore had suspended interest and principal payments to investors,

12    including Claimants, in late 2008, and that Claimants' accounts were in jeopardy.  Respondents

13    breached their fiduciary obligations, and otherwise engaged in wrongful conduct, by failing to

14    advise Claimants that Westmoore had suspended interest and principal payments to investors,

15    including Claimants, in late 2008.

16        58.    Upon information and belief, at all times relevant, Respondent SunTrust and

17    Crafton knew, or should have known, that the SEC was investigating Westmoore and that all

18    investments in Westmoore affiliated entities were at extreme risk of being lost or otherwise

19    devalued.  Respondents breached their fiduciary obligations, and otherwise engaged in wrongful

20    conduct, by failing to advise Claimants that the SEC had taken action against Westmoore and that

21    the value of his investment portfolio may be affected.

22        59.    Indeed, for months after the SEC began investigating Westmoore, Respondent

23    SunTrust continued to issue account statements to Claimants that identified his investment in

24    Westmoore affiliated entities and reported that said investments had a significant market value.

25    Upon information and belief, the SunTrust Respondents knew, or should have known, that the

26    information set forth in Claimants' account statements was likely materially false and otherwise

27    misleading.

28

14

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

**The SEC Takes Legal Action Against Westmoore**

60. Claimants are informed and believe that on or about March 21, 2010, Matt Jennings, principal of Westmoore, sent out another e-mail to all Westmoore Investors with the subject line "Westmoore Business Plan Update." Jennings discussed a "restructuring plan," stated that Westmoore planned to liquidate "various holdings held by Westmoore" and advised that Westmoore was to offer "three choices to investors regarding the payout or conversion to equity of their accounts." Additionally, in the March 2010 e-mail, Mr. Jennings invited investors to contact Westmoore representatives "regarding their situation over the phone or in person."

61. Claimants were not sent the March 2010 e-mail from Westmoore. Instead, the March 2010 e-mail from Westmoore was received by the SunTrust Respondents and not forwarded.

62. The SunTrust Respondents were, or should have been, aware of the March 2010 Westmoore e-mail, including that Westmoore was offering Westmoore investors – including Claimants – "three choices . . . regarding the payout or conversion to equity of their accounts"; however Respondents Crafton and SunTrust failed to advise Claimants of this information.

63. On or about June 15, 2010, the SEC filed a Complaint – a case styled *SEC v. Westmoore Investment, L.P., et al.* – United States District Court for the Central District of California, Case No. 10-cv-00849- against Westmoore, obtained a Temporary Restraining Order concerning Westmoore's assets and, ultimately, a Receiver was appointed to administer and liquidate Westmoore's assets.

64. On July 9, 2010, Charles Schwab notified investors that it would henceforth report values for the Westmoore entities as "N/A," for not available, due to the ongoing investigation by the SEC. These notices were sent to Claimants c/o SunTrust and never shown to Claimants by the SunTrust Respondents.

65. To make up for the drop in asset values that would appear on the Claimants' future account statements from Schwab, the SunTrust Respondents were given by Westmoore or their associates for the gifting to Claimants (and others) of shares in two publicly traded companies, Rineon Group and WLMG Holdings. The SunTrust Respondents received a

15

1   purported $25 million worth of these shares by mail on August 9, 2010.  In exchange, the

2   SunTrust Respondents agreed to have their clients purchase shares in Gerova Financial, a NYSE-

3   listed company, claiming to be a reinsurer based in Bermuda ("Gerova"), with certain ties to

4   Westmoore.  The addition of these stock certificates was intended by the SunTrust Respondents to

5   make up for the lost value of the Westmoore investments.  Clients were sent Stock Powers to

6   execute for Charles Schwab, the custodian.  Surtain appears to have signed such documents on

7   August 6, 2010 for 260,948 shares of WLMG Holdings and 161,193 shares of Rineon Group.

8   Subsequently, it was determined that the authenticity of these certificates could not be verified.

9   All three Claimants purchased significant amounts of stock in Gerova in July 2010.  SunTrust

10  unilaterally cancelled these Gerova purchases for Surtain and McCoy in October 2010, returning

11  their purchase price, without explaining to either of them the reason for their action.  Keiaho's

12  purchase was not cancelled, but he was subsequently able to negotiate a resolution of the purchase

13  in exchange for a release of claims against SunTrust.  Therefore he does not assert claims against

14  them herein.  Trading in Gerova was halted by the SEC on February 23, 2011.

15  **SunTrust Terminates Respondent Crafton's Employment**

16          66.     On information and belief, at some point, Respondent SunTrust commenced an

17  internal investigation of Respondents Crafton, Hamels, and Stuthers.  As a result of their internal

18  investigation, Respondent SunTrust determined that those Respondents had made material

19  misrepresentations concerning a certain "money fund" and that those Respondents had improperly

20  received shares of stock, or some other beneficial interest, in that "money fund."

21          67.     Upon information and belief, the findings of Respondent SunTrust's internal

22  investigation related to improper conduct of Respondent Crafton that concerned, at least, one or

23  more of the Westmoore affiliated entities and/or one or more entities owned/controlled by

24  Jennings, the principal of Westmoore.

25          68.     In or about September 2010, Respondent SunTrust terminated Respondents

26  Crafton, Hamels, and Stuthers' employment as a result of the findings associated with their

27  internal investigation.

28          69.     Although SunTrust representatives subsequently informed Claimants by letter that

16

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

1  these Respondents' employment had been terminated, at all times relevant, SunTrust failed to

2  advise Claimants of the fact that these Respondents had been the subject of an internal

3  investigation and/or the facts and circumstances giving rise to their termination.   Respondent

4  SunTrust breached its fiduciary obligations, and otherwise engaged in wrongful conduct, by

5  failing to advise Claimants of its knowledge of these Respondents' unlawful conduct.

6      70.    Respondent SunTrust breached its fiduciary obligations, and otherwise engaged in

7  wrongful conduct, by failing to advise Claimants of the fact that Respondents Crafton, Hamels,

8  and Stuthers were terminated for reasons that were related, or otherwise materially relevant, to

9  investments that had been made by Respondents in Claimants' accounts and/or other accounts

10  associated with Respondent Crafton.

11      71.    In late 2010, Respondent Crafton contacted Claimants to inform them that he had

12  been terminated by SunTrust.  In various conversations in late 2010, Respondent Crafton advised

13  Claimants that he and the others had been terminated because SunTrust disapproved of his "client

14  development strategy" and also stated that he believed SunTrust was "setting me [Crafton] up."

15      72.    Because Respondents SunTrust failed to advise Claimants of the facts and

16  circumstances surrounding Respondent Crafton's termination, Claimants had no reason to know

17  that Respondent Crafton's statements and representations were false.

18      73.    All of the investments described above became virtually worthless.  As a result of

19  Respondents' actions, Claimants have suffered catastrophic financial loss.

20                                **CAUSES OF ACTION**

21                              **FIRST CLAIM FOR RELIEF**

22      **Claim for Breach of Fiduciary Duties and/or Aiding and Abetting Breach of**
        **Fiduciary Duty Under California Law Against All Respondents**

23

24      74.    Claimants reallege and incorporate by reference, paragraphs 1 through 73 set forth

25  above.  Claimant Keiaho does not assert this claim against SunTrust.

26      75.    Investment advisors under the Investment Advisors Act of 1940 and California

27  law owe a fiduciary duty to their clients.  A fiduciary under California law has a duty to use the

28  amount of care that an ordinarily careful and prudent man would use in the management of his

                                       17

own affairs.  A financial advisor has a duty to make reasonable investment recommendations based on a reasonable inquiry into a client's investment objectives, financial situation and other factors, and always to place the client's interest above his or its own.  Consistent with a financial advisor's fiduciary duty, he should not recommend unregistered, non-exempt securities or receive undisclosed transaction-based or marketing compensation related to securities recommended to clients or for referring clients to another advisor broker-dealer.

76.    Respondents violated the fiduciary duties of care, loyalty, candor, good faith, and independence owed to Claimants and acted to put their personal interests ahead of the interests of Claimants', and/or have aided and abetted therein.

77.    By the acts, transactions and course of conduct alleged herein, Respondents failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Claimants by:

a.    failing to properly oversee and preserve Claimants' assets;

b.    ignoring or not protecting against the numerous conflicts of interest resulting from Respondents' own interrelationships or connection with the Westmoore entities and others;

c.    making false representations and omitting to state material facts relating to the investments in which Respondents placed Claimants;

d.    investing Claimants' monies in clearly unsuitable investments that were extremely high-risk and illiquid;

e.    investing Claimants' monies in concentrations that added to the high-risk nature of the investments;

f.    investing Claimants' monies in entities that were themselves intertwined and related with one another, increasing the investment risk;

g.    receiving for themselves undisclosed payments, fees or benefits for investing Claimants' monies and/or maintaining the investment; and

h.    failing to take action when it was clear that Claimants faced the possible loss of their investments or to mitigate those losses in a prudent fashion.

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

78.     By reason of the foregoing acts, practices and course of conduct, Respondents have grossly and willfully failed to exercise care and diligence in the exercise of their fiduciary obligations toward Claimants, and/or have aided and abetted therein.

79.     As a result of the actions of Respondents, Claimants have been severely damaged.

### SECOND CLAIM FOR RELIEF

### Claim for Constructive Fraud Against All Respondents

80.     Claimants reallege and incorporate by reference, paragraphs 1 through 79 set forth above.  This claim is not asserted by Keiaho against SunTrust.

81.     Under California law, an act or omission is considered fraudulent without relation to actual fraud where a fiduciary breaches his duty, without fraudulent intent, and thereby gains advantage by misleading another to his prejudice.

82.     By engaging in the acts and conduct alleged above, Respondents have committed a constructive fraud on Claimants.  Claimants justifiably relied on Respondents to their prejudice and have been damaged thereby.

### THIRD CLAIM FOR RELIEF

### Claim for Fraud and Deceit Against All Respondents

83.     Claimants reallege and incorporate by reference, paragraphs 1 through 79 set forth above.  This claim is not asserted by Keiaho against SunTrust.

84.     Respondents, and each of them, acting jointly and in concert, made intentional misrepresentations of material fact and deliberately omitted to state material facts known to them while under a duty to disclose such facts, including the facts described above.  As a result of this willful deception, Claimants invested with Respondents, relied on them to his detriment, and was damaged thereby.  Respondents made further misrepresentations and omitted material facts to willfully conceal their ongoing fraudulent conduct.

### FOURTH CLAIM FOR RELIEF

### California Corporations Code Sections 25401 and 25501 Against MKCM Respondents

85.     Claimants reallege and incorporate by reference, paragraphs 1 through 79 set forth above.

19

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

86.    The MKCM Respondents offered to sell and sold securities in this state to Claimants, as described above.

87.    The written and oral communications between the MKCM Respondents and Claimants omitted to state a number of material facts necessary to make the balance of the purchase communications, in the light of the circumstances under which they were made, not misleading, including the matters set forth above.

88.    Claimants were not aware of the material misrepresentations and omissions set forth above.

89.    Claimants seeks rescission of the transactions under California Corporations Code § 25501.  Alternatively, Claimants seeks damages under California Corporations Code § 25501. Specifically, Claimants seeks damages in an amount equal to the difference between: (l) the price at which Claimants purchased the securities, plus fees and commissions paid to Respondents, and (2) value of the securities at the time of the filing of this Complaint.

## FIFTH CLAIM FOR RELIEF

### California Corporations Code Section 25504 Against MKCM Respondents

90.    Claimants reallege and incorporate by reference, paragraphs 1 through 79 and 85-89, set forth above.

91.    The MKCM Respondents directly or indirectly controlled each other and/or were principal executive officers, directors or employees of MKCM.

92.    The MKCM Respondents materially aided in the acts, transactions, and conduct alleged above.

93.    The MKCM Respondents are jointly and severally liable to Claimants under California Corporations Code § 25504.

94.    Claimants seek rescission of the transactions under California Corporations Code §§ 25501 and 25504.  Alternatively, Claimants seek damages under California Corporations Code §§ 25501 and 25504.  Specifically, Claimants seek damages in an amount equal to the difference between: (l) the price at which Claimants purchased the securities, plus fees and commissions paid to Respondents, and (2) value of the securities at the time of the filing of this Complaint.

20

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

## PRAYER FOR RELIEF

WHEREFORE, Claimants prays for relief and judgment, as follows:

A.  Awarding compensatory damages in favor of Claimants against all Respondents (except for Keiaho vs. SunTrust), jointly and severally, for all damages sustained as a result of Respondents' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.  Awarding Claimants reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C.  Awarding rescission or a rescissory measure of damages;

D.  Awarding punitive and/or exemplary damages in an amount sufficient to punish Respondents; and

E.  Awarding such additional equitable, injunctive or other relief as deemed appropriate by the Court.

DATED: July 26, 2013

HULETT HARPER STEWART LLP
KIRK B. HULETT
BLAKE MUIR HARPER



BLAKE MUIR HARPER

225 Broadway, Suite 1350
San Diego, CA 92101
Telephone:    (619) 338-1133
Facsimile:     (619) 338-1139

Attorneys for Claimants

21

CLAIMANTS' DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM

# Exhibit 1

1   HULETT HARPER STEWART LLP
2   KIRK B. HULETT, SBN: 110726
    BLAKE MUIR HARPER, SBN: 115756
3   225 Broadway, Suite 1350
    San Diego, CA 92101
4   Telephone:    (619) 338-1133
    Facsimile:    (619) 338-1139
5   Email: kirk@hulettharper.com
            bmh@hulettharper.com
6
7   Attorneys for Plaintiff

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**05/06/2013** at 04:16:00 PM
Clerk of the Superior Court
By Calvin Beutler, Deputy Clerk

8   **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9   **IN AND FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| 10  PATRICK SURTAIN, | LEAD CASE NO. 37-2012-00098954-CU-FR-CTL |
| 11            Plaintiff, | [consolidated with Case Nos. 37-2012-00098956-CU-FR-CTL and 37-2012-00098955-CU-FR-CTL] |
| 12  v. | |
| 13  BILL CLAY CRAFTON JR., GAVIN | [IMAGED FILE] |
| 14  LUCAS HAMELS, DONALD MARTIN STUTHERS, MARTIN KELLY | **STIPULATION AND |P̶X̶X̶X̶X̶X̶X̶D̶  ORDER REGARDING ARBITRATION** |
| 15  CAPITAL MANAGEMENT, LLC, MARTIN KELLY ADVISORS LLC, | |
| 16  MICHAEL LOREN SEID, MAR VISTA MULTI STRATEGY FUND LP, and | |
| 17  DOES 1 through 30, inclusive, | JUDGE:     Honorable Judith F. Hayes |
| 18            Defendants. | DEPT:      C-68 |

19
20
21
22
23
24
25
26
27
28

1      IT IS HEREBY STIPULATED by and between the parties that all issues in this case are

2  appropriately ordered to arbitration pursuant to agreement under the provisions of the commercial

3  arbitration rules of the American Arbitration Association.

4      IT FURTHER STIPULATED that the case is STAYED pending the outcome of that

5  arbitration pursuant to California Code of Civil Procedure § 1281.4.  The parties shall notify the

6  Court of the result of the arbitration no later than 30 days after the arbitration decision.

7  DATED: April 30, 2013                    HULETT HARPER STEWART LLP
                                            KIRK B. HULETT
8                                           BLAKE MUIR HARPER

9

10                                          BLAKE MUIR HARPER

11
                                            225 Broadway, Suite 1350
12                                          San Diego, CA  92101
                                            Telephone:      (619) 338-1133
13                                          Facsimile:      (619) 338-1139

14
                                            Attorneys for Plaintiff
15

16  DATED:  April 30, 2013                  GORDON & REESE LLP
                                            JAMES GRADY
17                                          JILL RAFFEE

18

19

20                                          101 Broadway, Suite 1600
                                            San Diego, CA  92101
21                                          Telephone:      (619) 696-6700
                                            Facsimile:      (619) 696-7124
22

23                                          Attorneys for Defendants

24

25

26

27

28

1

STIPULATION AND **P̶X̶X̶X̶X̶X̶X̶D** ORDER

1   ***ORDER***

2        Plaintiff Patrick Surtain IS HEREBY ORDERED to arbitrate his dispute with defendants

3   in San Diego under the provisions of the commercial arbitration rules of the American Arbitration

4   Association.

5        IT IS FURTHER ORDERED that the case is STAYED pending the outcome of that

6   arbitration pursuant to Code of Civil Procedure § 1281.4. The parties shall notify the Court of the

7   result of the arbitration no later than 30 days after the arbitration decision.

8        IT IS SO ORDERED.

9   Date:   **5/14/2013**

    HONORABLE JUDITH F. HAYES
10  SAN DIEGO SUPERIOR COURT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# Exhibit 2

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**05/01/2013** at 11:35:00 AM

Clerk of the Superior Court
By Sandra Villanueva,Deputy Clerk

1   HULETT HARPER STEWART LLP
    KIRK B. HULETT, SBN: 110726
2   BLAKE MUIR HARPER, SBN: I15756
    225 Broadway, Suite 1350
3   San Diego, CA  92101
    Telephone:     (619) 338-1133
4   Facsimile:     (619) 338-1139
    Email:  bmh@hulettharper.com
5
6   Attorneys for Plaintiff
7
8         **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9              **IN AND FOR THE COUNTY OF SAN DIEGO**

10  NAIVOTE TAULAWAKEIAHO,                  CASE NO. 37-2012-00098954-CU-FR-CTL
                                            [consolidated with Case Nos. 37-2012-00098956-
11              Plaintiff,                  CU-FR-CTL and 37-2012-00098955-CU-FR-CTL]
12  v.                                      [IMAGED FILE]
13  BILL CLAY CRAFTON JR., GAVIN
    LUCAS HAMELS, DONALD MARTIN            **STIPULATION AND [PROPOSED] ORDER**
14  STUTHERS, MARTIN KELLY CAPITAL         **REGARDING ARBITRATION**
    MANAGEMENT, LLC, and DOES 1
15  through 30, inclusive,
16              Defendants.                 JUDGE:    Honorable Judith F. Hayes
                                            DEPT:     C-68
17
                                            DATE ACTION FILED:     06/14/2012
18
19
20
21
22
23
24
25
05/14/2013
26
27
28

                    STIPULATION AND [PROPOSED] ORDER

1      IT IS HEREBY STIPULATED by and between the parties that all issues this case are

2 appropriately ordered to arbitration in San Diego pursuant to agreement under the provisions of the

3 commercial arbitration rules of the American Arbitration Association.

4      IT FURTHER STIPULATED that the case is STAYED pending the outcome of that

5 arbitration pursuant to California Code of Civil Procedure § 1281.4. The parties shall notify the

6 Court of the result of the arbitration no later than 30 days after the arbitration decision.

7 DATED: April 30, 2013            HULETT HARPER STEWART LLP

8                               KIRK B. HULETT
                              BLAKE MUIR HARPER

9

10                               BLAKE MUIR HARPER

11

12                               225 Broadway, Suite 1350
                              San Diego, CA 92101

13                               Telephone:    (619) 338-1133
                              Facsimile:    (619) 338-1139

14

15                               Attorneys for Plaintiff

16 DATED: April 30, 2013            GORDON & REESE LLP

17                               JAMES GRADY
                              JILL RAFFEE

18

19

20                               101 Broadway, Suite 1600
                              San Diego, CA 92101

21                               Telephone:    (619) 696-6700

22                               Facsimile:    (619) 696-7124

23                               Attorneys for Defendants

24

25

26

27

28

1

STIPULATION AND [PROPOSED] ORDER

1
***ORDER***

2        Plaintiff Naivote Taulawakeiaho IS HEREBY ORDERED to arbitrate his dispute with

3    defendants in San Diego under the provisions of the commercial arbitration rules of the American

4    Arbitration Association.

5        IT IS FURTHER ORDERED that the case is STAYED pending the outcome of that

6    arbitration pursuant to Code of Civil Procedure § 1281.4. The parties shall notify the Court of the

7    result of the arbitration no later than 30 days after the arbitration decision.

8        IT IS SO ORDERED.

9    Date:  **05-08-2013**

10   HONORABLE JUDITH F. HAYES
     SAN DIEGO SUPERIOR COURT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

STIPULATION AND [PROPOSED] ORDER

# Exhibit 3

1  HULETT HARPER STEWART LLP
2  KIRK B. HULETT, SBN: 110726
   BLAKE MUIR HARPER, SBN: 115756
3  225 Broadway, Suite 1350
   San Diego, CA  92101
4  Telephone:      (619) 338-1133
   Facsimile:      (619) 338-1139
5  Email:  kirk@hulettharper.com
6          bmh@hulettharper.com

7  Attorneys for Plaintiff

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**05/06/2013** at 04:15:00 PM
Clerk of the Superior Court
By Calvin Beutler,Deputy Clerk

8  **THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9  **IN AND FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| 10  MATT MCCOY, | LEAD CASE NO. 37-2012-00098954-CU-FR-CTL |
| 11             Plaintiff, | [consolidated with Case Nos. 37-2012-00098956-CU-FR-CTL and 37-2012-00098955-CU-FR-CTL] |
| 12  v. | [IMAGED FILE] |
| 13  BILL CLAY CRAFTON JR., GAVIN LUCAS HAMELS, DONALD MARTIN | **STIPULATION AND [PXXXXXXD] ORDER REGARDING ARBITRATION** |
| 14  STUTHERS, MARTIN KELLY CAPITAL MANAGEMENT, LLC, and | |
| 15  DOES 1 through 30, inclusive, | |
| 16             Defendants. | JUDGE:      Honorable Judith F. Hayes |
| 17 | DEPT:      C-68 |
| 18 | DATE ACTION FILED:      06/14/12 |

19

20

21

22

23

24

25

26

27

28

STIPULATION AND **PXXXXXXD** ORDER

1        IT IS HEREBY STIPULATED by and between the parties that all issues in this case are

2  appropriately ordered to arbitration in San Diego pursuant to agreement under the provisions of the

3  commercial arbitration rules of the American Arbitration Association.

4        IT FURTHER STIPULATED that the case is STAYED pending the outcome of that

5  arbitration pursuant to California Code of Civil Procedure § 1281.4.  The parties shall notify the

6  Court of the result of the arbitration no later than 30 days after the arbitration decision.

7  DATED: April 30, 2013          HULETT HARPER STEWART LLP
                               KIRK B. HULETT

8                             BLAKE MUIR HARPER

9

10                             BLAKE MUIR HARPER

11

12                             225 Broadway, Suite 1350
                             San Diego, CA  92101

13                             Telephone:    (619) 338-1133
                             Facsimile:    (619) 338-1139

14

15                             Attorneys for Plaintiff

16  DATED: April 30 2013           GORDON & REESE LLP
                             JAMES GRADY

17                             JILL RAFFEE

18

19

20                             101 Broadway, Suite 1600
                             San Diego, CA  92101

21                             Telephone:    (619) 696-6700

22                             Facsimile:    (619) 696-7124

23                             Attorneys for Defendants

24

25

26

27

28

1

STIPULATION AND **PXXXXXXD** ORDER

1

***ORDER***

2    Plaintiff Matt McCoy IS HEREBY ORDERED to arbitrate his dispute with defendants in

3  San Diego under the provisions of the commercial arbitration rules of the American Arbitration

4  Association.

5    IT IS FURTHER ORDERED that the case is STAYED pending the outcome of that

6  arbitration pursuant to Code of Civil Procedure § 1281.4. The parties shall notify the Court of the

7  result of the arbitration no later than 30 days after the arbitration decision.

8    IT IS SO ORDERED.

9  Date: __5/14/2013__                    _____

10                                HONORABLE JUDITH F. HAYES
                               SAN DIEGO SUPERIOR COURT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# Exhibit 4

# Martin Kelly Capital Management
# Financial Services Agreement

This agreement is made and entered into on *November 6, 2006* by and between Martin Kelly Capital Management (Martin Kelly) and **Matt McCoy** (Client).

1. **Services to Be Provided.** Client hereby retains Martin Kelly to provide financial advisory and investment counseling services. Martin Kelly agrees to perform such services for Client.

2. **Scope of Services.** It is agreed that the services to be provided by Martin Kelly under this Agreement do not include contract negotiations or merchandising or other services customarily provided by agents (obtaining personal appearances, endorsements, or other promotional activities) for Client.

3. **Non-Exclusive Relationship.** The Client acknowledges and agrees that Martin Kelly may provide services to other clients and receive fees for such services. The advice given and the actions taken with respect to such clients may differ from advice given with respect to the Client.

4. **Fees.** For financial advisory services, Martin Kelly's compensation shall be _____ annually. For investment counseling services, Martin Kelly's annual fee shall be __1__% of the value of assets under management. The investment counseling fees shall be payable quarterly in arrears at the end of each calendar quarter based on the average of the net market values of the Account at the close of trading on the last business day of the three preceding months. (For example, the fee for the first quarter of 2007 would be based on the average net of the market values of the account on December 31, 2006, January 31, 2007 and February 28, 2007.)

5. **Discretion.** Client gives Martin Kelly the authority and discretion to supervise and direct the investments of all of Client's accounts maintained by Martin Kelly on Client's behalf with any brokerage firm, subject to such limitations as Client may impose by notice in writing. Martin Kelly, as agent and attorney-in-fact with respect to such accounts, may, when deemed appropriate by Martin Kelly and without prior consultation with Client, (a) buy, sell, exchange, convert, and otherwise trade in any stocks, bonds, and other securities, and (b) place orders for the execution of such securities transactions with or through such brokers, dealers, or issuers as Martin Kelly may select. Unless Martin Kelly otherwise agrees in writing, Martin Kelly will not have any duty or obligation to advise or take any action on behalf of Client in any legal proceedings, including bankruptcies or class actions, involving securities held in or formerly held in the account or the issuers of securities.

6. **Liability.** The Client agrees that Martin Kelly shall not be liable for anything done or omitted by it under this Agreement so long as it shall have acted in good faith, and if negligence, willful or reckless misconduct or violation of applicable law is not involved. The federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing in this agreement will waive or limit any rights that a client may have under federal and state securities law.

7.    **Termination.**  This agreement shall continue until terminated either by Client or Martin Kelly for any reason. If either party desires to terminate this agreement, it shall give the other party notice of termination, which shall fix the effective date of termination.  In the event this agreement shall be terminated for any reason at any time other than on the anniversary date of the contract, Martin Kelly shall be entitled to a pro rata portion of its fee, based upon the number of months of representation until the date of termination. Such termination shall not, however, affect liabilities or obligations incurred or arising from transactions initiated under this agreement prior to such termination of this agreement. If the Client terminates this agreement within five (5) business days of its signing, the Client will receive a full refund of all fees and expenses.

8.    **Applicable Law.**  This Agreement shall be interpreted in accordance with the laws of the State of California.

9.    **Assignment of Interest.**  This agreement shall be binding upon and shall inure to the benefit of the parties herein to their respective successors, assigns, heirs and personal representatives.  This agreement may not be amended, transferred, or assigned by either party without the prior consent of the other party.

10.    **Representations.**  Martin Kelly represents that it is registered as an investment adviser under the Investment Advisers Act of 1940 and is authorized and empowered to enter into this agreement. The Client represents that he or she is authorized and empowered to enter into this agreement. If this agreement is being signed on behalf of a corporation, partnership, trust or other business legal entity, the Client represents that applicable law and governing documents authorize and permit this agreement.

11.    **Notice.** Any notice or other communication required or permitted to be given pursuant to this agreement shall be deemed to have been duly given when delivered in person, or sent by telecopy, sent by overnight courier, or three days after mailing by registered mail (postage prepaid). All notices or communications to Martin Kelly should be sent to the Martin Kelly's main address at:

Martin Kelly Capital Management        Phone:       858-617-6764
322 8th Street                                      Fascimile:   858-617-6201
Suite 100
Del Mar, California, 92014

All notices or communications to the Client will be sent to the address provided by Client.

12.    **Severability.** If any part of this agreement is found to be invalid or unenforceable, it will not affect the validity or enforceability of the remainder of this agreement.

13.    **Disclosure Document.** The Client acknowledges receipt of Martin Kelly's form ADV, Part II or similar disclosure document.

14.    **Entire Agreement.**  This agreement contains all agreements of the parties with respect to any matters mentioned herein and supersedes all prior negotiations, understandings and agreements by and between the parties hereto. This agreement may not be altered, amended or modified in any manner whatever, excepting only by subsequent written agreement.

15. **Amendments.** Martin Kelly shall have the right to amend this agreement by modifying or rescinding any of its existing provisions or by adding new provisions. Any such amendment shall be effective 30 days after Martin Kelly has notified the Client in writing of any change or such later date as is established by Martin Kelly.

16. **Notice of Proxy Voting**. Martin Kelly will vote any and all proxies for any account on which it has proxy voting authority. Decisions about how to vote on a proxy will be made based on the best interests of an account. In general, Martin Kelly will vote in favor of routine proposals, such as those for the election of auditors, and against proposals that in any way restrict a shareholder's ability to realize the full potential value of their investment, such as anti-takeover measures and cumulative voting rights). Other proposals, such as officer and director stock plans, will be reviewed on a case-by-case basis. In the event that voting on a proposal may cause a conflict of interest, Martin Kelly will vote as described above unless doing so does not address the potential conflict. In this case, Martin Kelly will communicate the proxy information and intended vote to the client. Martin Kelly will vote these proxies as decided by the client unless client does not respond within a reasonable period of time, in which case Martin Kelly will vote as communicated to the client.

17. **Arbitration Provision.** It is agreed that any controversy between the Adviser and the Client arising out of Adviser business or this agreement, shall be submitted to arbitration conducted under the provisions of the commercial arbitration rules of the American Arbitration Association. Arbitration must be commenced by service upon the other party of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the Client does not make such election within five (5) days of such demand or notice, then the Client authorizes the Adviser to do so on the Client's behalf. Judgment upon any award rendered by the arbitrators shall be final and may be entered in any court having jurisdiction thereof. This clause does not constitute a waiver of any right including the right to choose the forum, whether arbitration or adjudication, in which to seek resolution of disputes.

Client:

Signature: _____

Date: _____

Martin Kelly Capital Management

By: _____

Date: 11-6-06

- 3 -

# Exhibit 5

# Martin Kelly Capital Management
# Financial Services Agreement

This agreement is made and entered into on **August 15, 2006** by and between Martin Kelly Capital Management (Martin Kelly) and **Freddie Keiaho** (Client).

1. **Services to Be Provided.**  Client hereby retains Martin Kelly to provide financial advisory and investment counseling services. Martin Kelly agrees to perform such services for Client.

2. **Scope of Services**.  It is agreed that the services to be provided by Martin Kelly under this Agreement do not include contract negotiations or merchandising or other services customarily provided by agents (obtaining personal appearances, endorsements, or other promotional activities) for Client.

3. **Non-Exclusive Relationship.** The Client acknowledges and agrees that Martin Kelly may provide services to other clients and receive fees for such services. The advice given and the actions taken with respect to such clients may differ from advice given with respect to the Client.

4. **Fees.** For investment counseling services, Martin Kelly's annual fee shall be 1.0% of the value of assets under management. The investment counseling fees shall be payable quarterly in arrears at the end of each calendar quarter based on the average of the net market values of the Account at the close of trading on the last business day of the three preceding months. (For example, the fee for the first quarter of 2007 would be based on the average net of the market values of the account on December 31, 2006, January 31, 2007 and February 28, 2007.)

5. **Discretion.**  Client gives Martin Kelly the authority and discretion to supervise and direct the investments of all of Client's accounts maintained by Martin Kelly on Client's behalf with any brokerage firm, subject to such limitations as Client may impose by notice in writing. Martin Kelly, as agent and attorney-in-fact with respect to such accounts, may, when deemed appropriate by Martin Kelly and without prior consultation with Client, (a) buy, sell, exchange, convert, and otherwise trade in any stocks, bonds, and other securities, and (b) place orders for the execution of such securities transactions with or through such brokers, dealers, or issuers as Martin Kelly may select. Unless Martin Kelly otherwise agrees in writing, Martin Kelly will not have any duty or obligation to advise or take any action on behalf of Client in any legal proceedings, including bankruptcies or class actions, involving securities held in or formerly held in the account or the issuers of securities.

6. **Liability.**    The Client agrees that Martin Kelly shall not be liable for anything done or omitted by it under this Agreement so long as it shall have acted in good faith, and if negligence, willful or reckless misconduct or violation of applicable law is not involved. The federal and state securities laws impose liabilities under certain circumstances on persons who act in good faith, and therefore nothing in this agreement will waive or limit any rights that a client may have under federal and state securities law.

7. **Termination.** This agreement shall continue until terminated either by Client or Martin Kelly for any reason. If either party desires to terminate this agreement, it shall give the other party notice of termination, which shall fix the effective date of termination. In the event this agreement shall be terminated for any reason at any time other than on the anniversary date of the contract, Martin Kelly shall be entitled to a pro rata portion of its fee, based upon the number of months of representation until the date of termination. Such termination shall not, however, affect liabilities or obligations incurred or arising from transactions initiated under this agreement prior to such termination of this agreement. If the Client terminates this agreement within five (5) business days of its signing, the Client will receive a full refund of all fees and expenses.

8. **Applicable Law.** This Agreement shall be interpreted in accordance with the laws of the State of California.

9. **Assignment of Interest.** This agreement shall be binding upon and shall inure to the benefit of the parties herein to their respective successors, assigns, heirs and personal representatives. This agreement may not be amended, transferred, or assigned by either party without the prior consent of the other party.

10. **Representations.** Martin Kelly represents that it is registered as an investment adviser under the Investment Advisers Act of 1940 and is authorized and empowered to enter into this agreement. The Client represents that he or she is authorized and empowered to enter into this agreement. If this agreement is being signed on behalf of a corporation, partnership, trust or other business legal entity, the Client represents that applicable law and governing documents authorize and permit this agreement.

11. **Notice.** Any notice or other communication required or permitted to be given pursuant to this agreement shall be deemed to have been duly given when delivered in person, or sent by telecopy, sent by overnight courier, or three days after mailing by registered mail (postage prepaid). All notices or communications to Martin Kelly should be sent to the Martin Kelly's main address at:

> Martin Kelly Capital Management    Phone:       858-617-6764
> 322 8th Street                     Fascimile:   858-617-6201
> Suite 100
> Del Mar, California, 92014

All notices or communications to the Client will be sent to the address provided by Client.

12. **Severability.** If any part of this agreement is found to be invalid or unenforceable, it will not affect the validity or enforceability of the remainder of this agreement.

13. **Disclosure Document.** The Client acknowledges receipt of Martin Kelly's form ADV, Part II or similar disclosure document.

14. **Entire Agreement.** This agreement contains all agreements of the parties with respect to any matters mentioned herein and supersedes all prior negotiations, understandings and agreements by and between the parties hereto. This agreement may not be altered, amended or modified in any manner whatever, excepting only by subsequent written agreement.

15. **Amendments.** Martin Kelly shall have the right to amend this agreement by modifying or rescinding any of its existing provisions or by adding new provisions. Any such amendment shall be effective 30 days after Martin Kelly has notified the Client in writing of any change or such later date as is established by Martin Kelly.

16. **Notice of Proxy Voting.** Martin Kelly will vote any and all proxies for any account on which it has proxy voting authority. Decisions about how to vote on a proxy will be made based on the best interests of an account. In general, Martin Kelly will vote in favor of routine proposals, such as those for the election of auditors, and against proposals that in any way restrict a shareholder's ability to realize the full potential value of their investment, such as anti-takeover measures and cumulative voting rights). Other proposals, such as officer and director stock plans, will be reviewed on a case-by-case basis. In the event that voting on a proposal may cause a conflict of interest, Martin Kelly will vote as described above unless doing so does not address the potential conflict. In this case, Martin Kelly will communicate the proxy information and intended vote to the client. Martin Kelly will vote these proxies as decided by the client unless client does not respond within a reasonable period of time, in which case Martin Kelly will vote as communicated to the client.

17. **Arbitration Provision.** It is agreed that any controversy between the Adviser and the Client arising out of Adviser business or this agreement, shall be submitted to arbitration conducted under the provisions of the commercial arbitration rules of the American Arbitration Association. Arbitration must be commenced by service upon the other party of a written demand for arbitration or a written notice of intention to arbitrate, therein electing the arbitration tribunal. In the event the Client does not make such election within five (5) days of such demand or notice, then the Client authorizes the Adviser to do so on the Client's behalf. Judgment upon any award rendered by the arbitrators shall be final and may be entered in any court having jurisdiction thereof. This clause does not constitute a waiver of any right including the right to choose the forum, whether arbitration or adjudication, in which to seek resolution of disputes.

Client:    Freddie Keiaho

Signature:

Date:    8/14/2006

Martin Kelly Capital Management

By:

Date:    8/14/2006